UNITED STATES of America,
Plaintiff-Appellee,

v.

The STATE OF NEW MEXICO, and Carlos L. Jaramillo, Director, Department of Alcoholic Beverage Control, Defendants-Appellants.

No. 77–1309.

United States Court of Appeals,
Tenth Circuit.

Argued Sept. 27, 1978.

Decided Dec. 18, 1978.

Ruth C. Streeter, Asst. U. S. Atty., Albuquerque, N. M. (Victor R. Ortega, U. S. Atty., Albuquerque, N. M., and Steve E. Carroll, Land and Natural Resources Division, Dept. of Justice, Washington, D. C., on the brief), for plaintiff-appellee.

Don Klein, Asst. Atty. Gen., Santa Fe, N. M. (Toney Anaya, Atty. Gen. of N. M., and Thomas L. Dunigan, Deputy Atty. Gen., Santa Fe, N. M., on the brief), for defendants-appellants.

Before SETH, Chief Judge, DOYLE, Circuit Judge, and STANLEY,* Senior District Judge.

WILLIAM E. DOYLE, Circuit Judge.

This is an appeal by the State of New Mexico from a declaratory judgment entered by the United States District Court

* Of the District of Kansas, sitting by designation.

for the District of New Mexico, January 31, 1977. In essence it ruled that the Mescalero Apache Tribe was not subject to the liquor licensing authority of the State of New Mexico with respect to liquor outlets located within the exterior boundaries of the Mescalero Apache Reservation. New Mexico contends that it is authorized to license and thus control the liquor traffic on the Reservation. The action is alleged to have arisen pursuant to 28 U.S.C. § 1345 together with Rule 65 of the Federal Rules of Civil Procedure, and 28 U.S.C. §§ 2201, 2202. No substantial dispute exists as to the facts. There were stipulations as to most of these, and they are set forth in the findings, conclusions and judgment of the trial court.

The Mescalero Indian Tribe was formally placed under the control of the government in the Treaty of July 1, 1852, between the United States and representatives of the Mescalero Apache Tribe. Under the terms of this Treaty, the Tribe is exclusively subject to the laws, jurisdiction and government of the United States of America. Its lands are held in trust by the United States for the benefit of the Mescalero Apache Tribe. The Tribe has a government which has been created under 25 U.S.C. § 476. Under the terms of the Treaty the tribal government exercises full sovereign powers within the boundaries of the Reservation, except for the control surrendered by it to the United States as trustee. The Tribe has adopted an ordinance (published in 30 Fed.Reg. 3553), pertaining to the sale and consumption of alcoholic beverages within the exterior boundaries of the Mescalero Indian Reservation. 18 U.S.C. § 1161 was found by the court to render the federal statutes, which previously had prohibited the sale and use of liquor by the Indians, not applicable to "any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register."

The Tribe has actually operated a bar in the community of Mescalero for 10 years without having any state license to do so.

On April 2, 1965, the Chief of the New Mexico Division of Liquor Control acknowledged in a letter to the Mescalero Tribe's council that an Indian tribe could establish its own liquor operation on reservation land without being subject to the control of the New Mexico Liquor Division.

Liquor is now being sold in the Inn of the Mountain Gods, a large resort complex, and at the tribal bar at Mescalero without a state license, without a tribal license and without any other kind of license authorizing liquor sales.

The trial court ruled that under the tribal ordinance, 30 Fed.Reg. 3553, the Tribe was not required to obtain a liquor license from the state in order to sell intoxicating beverages within the boundaries of the Reservation. Since July 1975, the beverages have been sold at the Inn of the Mountain Gods. That institution, together with the tribal bar in Mescalero and the bar at Apache Summit, which is licensed by New Mexico, are all located within the exterior boundaries of the Mescalero Apache Reservation. The Inn of the Mountain Gods is owned by the Tribe and is operated for the benefit of its education, social and economic welfare program on behalf of the people of the Mescalero Apache Tribe. The budget of the Inn is submitted for approval to the Bureau of Indian Affairs. Tribal ordinances are enforced on the premises of the Inn by those on the staff. Also, the federal government maintains six officers on the Mescalero Reservation for enforcement of federal law.

The trial court also found that due to state quota restrictions the cost of purchase of a license (for use at the Inn) would be $50,000. It was recognized by the court that this would place a financial burden on the Tribe.

The trial court found, in addition, that New Mexico had never sought to assert civil or criminal jurisdiction over the Mescalero Apache Reservation. The present action was precipitated as a result of New Mexico

ordering all wholesalers in the State to cease delivery to the tribal bars and by the threat of New Mexico to send its law enforcement personnel into the Reservation to enforce state laws concerning the liquor traffic. The court concluded that as between the Mescalero Tribe and the State of New Mexico, the Tribe had sole jurisdiction over the licensing of tribal-owned liquor outlets and had sole authority to regulate the sale of alcoholic beverages at those outlets within the exterior boundaries of the Mescalero Apache Reservation.

Based upon the trial court's ruling that the State of New Mexico lacked authority to regulate liquor traffic on the Reservation, it permanently enjoined the State and its officers and agents from entering on the Reservation to enforce state laws concerning licensing and regulation of liquor sales owned by the Mescalero Apache Tribe within the boundaries of the Reservation and enjoined the State and it officers from prohibiting wholesalers from selling liquor to tribal-owned outlets.

Questions which the State tendered are the following:

First, whether by reason of 18 U.S.C. § 1161 and the Act of August 15, 1953, 67 Stat. 586, the laws of the State of New Mexico with respect to the licensing and regulation of the possession, sale, service and consumption of alcoholic beverages apply to tribally-owned and operated facilities within the exterior boundaries of the Mescalero Apache Indian Reservation.

The second question is a slightly different version of the same question. It is whether the State of New Mexico is authorized by the laws of the United States to enforce its laws pertaining to licensing and regulation of the possession, sale, service and consumption of alcoholic beverages on tribally-owned and operated facilities within the exterior boundaries of the Mescalero Apache Indian Reservation.

Third, (this is also a replica) whether the injunction entered by the district court prohibiting the State of New Mexico from enforcing its laws with respect to liquor licensing and regulation is valid and should be upheld.

The Act of Congress on which New Mexico relies is 18 U.S.C. § 1161. In essence it provides that the liquor prohibitions in the prior federal statutes, §§ 1154, 1156, 3113, 3488 and 3618 do not apply within an area that is outside Indian country nor to any act or transaction within Indian country provided that it is "in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction . . . ., certified by the Secretary of the Interior."

The State's position, therefore, depends on its obtaining a construction of § 1161, *supra*, which finds that the words "in conformity both with the laws of the State" are tantamount to saying that the licensing authority is granted to the state, so our principal inquiry is whether this clause was designed to grant licensing and regulation of liquor on tribal lands to the State of New Mexico. We conclude that no such meaning can be attributed to § 1161, *supra*, and that the trial court's judgment in this regard is to be affirmed.

## I.

The boundaries of Indian country and of the Mescalero Tribe are the same. *See United States v. Mazurie*, 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975).

The decision of the Supreme Court in *United States v. Mazurie, supra*, is a leading one which virtually decides the present question. The conflict in that case was not between the tribe and the state, however. It was between the Wind River Tribes and an individual bar or tavern owner, who operated his business within an unincorporated village inside the Wind River Reservation. Following the enactment of § 1161, *supra*, the Tribe had passed an ordinance in conformity with it and had denied a tribal license to the bar, which was held to be located in Indian country. Mazurie, the bar owner, filed an action in federal district court seeking to compel the issuance of a license. The district court held that the

location of the bar was within the tribal boundaries and, considering the composition of the residents, was located within Indian country, whereby § 1161, *supra*, applied. This court, however, reversed the district court's ruling on the basis that the prosecution had not met its burden of proving that the bar was within Indian country. The decision also questioned whether Congress could delegate such authority to an Indian tribe.

The Supreme Court set this straight by reversing and holding that § 1161, *supra*, was not vague; that the bar's location rendered it subject to tribal regulation; that the fact of ownership in fee of the land was not significant; and that Congress still had the authority to delegate such regulatory power to a tribal council.

It is true that the question of state regulation was not considered, but there was no doubt or exception expressed concerning the authority of Congress to delegate this power to the tribe. The Court cited with approval from one of its early decisions, *Perrin v. United States*, 232 U.S. 478, 482, 34 S.Ct. 387, 58 L.Ed. 691 (1914), as follows:

" 'The power of Congress to prohibit the introduction of intoxicating liquors into an Indian reservation, wheresoever situate, and to prohibit traffic in such liquors with tribal Indians, whether upon or off a reservation and whether within or without the limits of a State, does not admit of any doubt. It arises in part from the clause in the Constitution investing Congress with authority 'to regulate commerce with foreign nations, and among the several states, and with the Indian tribes,' and in part from the recognized relation of tribal Indians to the Federal Government.' 232 U.S., at 482 [, 34 S.Ct., at 389]".

419 U.S. at 555, 95 S.Ct. at 716.

*Perrin* was a pre-§ 1161 decision, but it attests to the scope and extent of the power of Congress to regulate in this area. The Supreme Court reasoned that while there are limitations on the extent to which Congress can delegate its powers, these limitations are less restrictive when the delega-tion is to an independent governmental unit. When an entity has sovereignty of its own, Congress' power of delegation to it is likely to be valid.

Another decision of the Supreme Court, that of *Warren Trading Post v. Arizona Tax Commission*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), contrasts the standard in § 1161, *supra*, with laws delegating authority to the state in other areas. In the latter the intent to empower state exercise of authority over reservations is required to be very clear. If agents of a state are to be permitted to enter tribal land, the authority from Congress or the Secretary of the Interior must be plain. In that case the operator of a retail trading post on the Navajo Indian Reservation had been licensed by the Commissioner of Indian Affairs. The trading post challenged the right of Arizona to levy a tax on its income derived from trading with reservation Indians. The Supreme Court in denying the authority of the state to levy such a tax reasoned that the powers of the federal government over the tribal lands resulted in relieving the state of any duties, which it otherwise might have, to provide protection, etc., and thus it could not justify levying a tax on income derived from trading on the reservation. To allow the state to do so would permit them to put a burden on the traders or the Indians. The Court said:

Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities. * * *

380 U.S. at 690, 85 S.Ct. at 1245.

■ *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973), involved an attempt by Arizona to impose a tax on the income of Navajo Indians residing on the reservation and whose income was derived wholly from reservation sources. Arizona was held to lack jurisdiction. The governing principles were that the policy relieving Indians from

state jurisdiction and control is deeply rooted in the nation's history, having first been set forth in the opinion of Chief Justice Marshall, which recognized that Indian nations were distinct political communities, having territorial boundaries in which their authority is exclusive and having a right to the lands within those boundaries which is acknowledged and guaranteed by the United States. *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 557, 8 L.Ed. 483 (1832).

The concept of Indian sovereignty was said to be important (in *McClanahan*), not necessarily because it resolves the issues, but because it provides a background for reading the applicable treaties and statutes. The background shows the tribes to have been independent and sovereign nations, and even though the Navajos who were involved in the *McClanahan* case did not have an express guarantee of freedom or exemption from state taxes in its treaty, the concept of sovereignty nevertheless precludes efforts by the state to tax Indians on the reservation. The case points out that when Arizona entered the union its entry was conditioned on the right and title to Indian lands remaining subject to the disposition of and under the control of Congress.

More recently, in *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), the Supreme Court ruled that Montana was precluded from levying cigarette sales taxes, personal property taxes and issuing vendor's licenses to sell cigarettes on the Indian reservation to Indians. The Court spoke out for uniform rules and not checkerboard enforcement. Those proposals were said to "conflict with the congressional statutes which provide the basis for decision with respect to such impositions. *McClanahan, supra*; *Mescalero Apache Tribe v. Jones*, 411 U.S. 145 [93 S.Ct. 1267, 36 L.Ed.2d 114] (1973)." 425 U.S. at 480–81, 96 S.Ct. at 1645.

In an even more recent case, that of *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), the Supreme Court again emphasized the need for Congress to explicitly grant power to the state in order for the latter to exercise regulatory power in Indian country. It said that this could not be left to inference. Here Congress had granted jurisdiction over civil causes of action or causes to which Indians were parties to state courts to the same extent that the states had jurisdiction over civil causes of action. The question was whether this allowed the state to exercise regulatory power in Indian country. The Supreme Court said no, because the Act had not explicitly granted such power. Congress, it is said, had not intended to have jurisdiction inferred, and so the only grant was to hear cases.

■ In summary, the cases stress that regulatory powers in Indian country or on Indian lands belong to the Congress except for inherent jurisdiction of the tribes. Congress may delegate this authority to the state, but when it does so it must be in specific terms. Section 1161, *supra*, does not delegate this authority either expressly or impliedly.

■ The legal basis of this is the authority of Congress to regulate commerce with the Indian tribes under the United States Constitution art. I, § 8, cl. 3. Under this Congress is empowered to prohibit or regulate (1) the sale of alcoholic beverages to tribal Indians, and (2) the introduction of alcoholic beverages into Indian country. *United States v. Mazurie, supra.*

Until 1953, Congress prohibited altogether the sale and use of alcoholic beverages by the Indians. Section 1161, *supra*, was enacted in 1953 so as to eliminate this *federally imposed prohibition on liquor dealings with the Indians.* S.Rep.No.722, 83d Cong., 1st Sess., *reprinted in* [1953] U.S.Code Cong. & Admin.News pp. 2399–2400. The legislation was intended also to end discrimination against the Indians in areas where they were treated differently from non-Indians. *Id.* at 2400. Although the statute ended federal liquor prohibition, it consented to tribal prohibition if it was desired by the tribe.

In sum:

■ The cases deal with the scope and the extent of *government power over the*

Indian tribes and lack of state authority in this area. We cannot perceive any semblance of support for the State's position that Congress intended to empower it to regulate the liquor traffic on Indian reservations. So if there is any ambiguity in the statute, the cases dispel it.

## II.

We have read the arguments of the State of New Mexico which seek to present legislative history material, but these fail to evidence the kind of intent and purpose which New Mexico seeks to establish.

In addition to legislative history, the State's brief cites statutory provisions which deal with other more or less related subjects in an effort to provide support for their argument that these somehow confer jurisdiction on the state to police liquor problems and therefore to license the liquor trade on Indian reservations. We disagree with these arguments, and we here are not going to deal with what has been said beyond showing some examples which illustrate the remoteness of their contentions.

Their legislative history arguments are particularly remote. They cite Representative Patten of New Mexico and a statement made by him during the early stages of the consideration by Congress of what later became § 1161. His remarks primarily deal with the removal of the prohibition of liquor as to the Indians.

An argument is made in respect to Public Law 277. In the New Mexico Enabling Act, New Mexico agreed to provide in the state constitution that liquor sales to Indians were prohibited. In 1953, express authority was given to New Mexico to amend its constitution. P.L. 277 (67 Stat. 586). The argument is that the repealing impliedly granted the state jurisdiction over liquor. No such implied grant is apparent.

The consent given by the federal government to states provided for in 25 U.S.C. §§ 1321, 1322 is relied on. This pertains to the consent by the government to a state assuming criminal and civil jurisdiction. The exercise of this jurisdiction must, however, be with the consent of the Indian tribe under § 1321. This includes the civil jurisdiction. Section 1322 provides that this is exercisable only with the consent of the tribe under § 1322.

Apprehension is expressed by New Mexico that it will lose all criminal jurisdiction over the Indians by an unfavorable decision on this liquor licensing issue. Not so. This case is limited to liquor licensing.

New Mexico further argues that the Indians will next have gambling. This issue is obviously not before us.

■ Nor does the Twenty-First Amendment permit state liquor licensing. We see nothing in that provision which authorizes the states to regulate liquor licensing for the Indians.

New Mexico cannot derive any aid and assistance from the taxing cases. *See Warren Trading Post v. Arizona Tax Commission, supra,* and *Mescalero Apache Tribe v. Jones,* 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973). This latter does not deal with taxing income or property on the reservation.

The collateral sources cited by the State are not more persuasive than the direct arguments which are made.

Our conclusion is that the judgment of the trial court must be affirmed. It is so ordered.