Eva REHNER, Plaintiff-Appellee,

v.

Baxter RICE, Individually and as Director of the Department of Alcoholic Beverage Control of the State of California, Defendant-Appellee.

MUCKLESHOOT INDIAN TRIBE, Plaintiffs-Appellees,

v.

STATE of WASHINGTON, et al., Defendants-Appellants.

The TULALIP TRIBES OF WASHINGTON, an Indian Tribe, Plaintiffs-Appellees,

v.

STATE of WASHINGTON, et al., Defendants-Appellants.

Nos. 77–2409, 79–4403 and 79–4404.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 10, 1982.

Decided June 8, 1982.

Stephan V. Quesenberry, Seattle, Wash., Art Bunce, Escondido, Cal., Indian Legal Services, for Rehner.

Matthew J. Coyle, Asst. Atty. Gen., Olympia, Wash., argued, for State of Wash.; Slade Gorton, Atty. Gen., Malachy R. Murphy, Deputy Atty. Gen., Olympia, Wash., on brief.

William R. Winship, Jr., Alan S. Meth, San Diego, Cal., argued, for Rice; Evelle J. Younger, Atty. Gen., Sacramento, Cal., on brief.

Richard Reich, Auburn, Wash., for Muckleshoot Tribe.

Douglas L. Bell, Everett, Wash., for Tulalip Tribe.

Before BROWNING, Chief Judge, CHOY, GOODWIN, WALLACE, KENNEDY, TANG, FARRIS, PREGERSON, POOLE, CANBY, REINHARDT, Circuit Judges.

TANG, Circuit Judge:

The three cases involved in this decision arise under different facts, but the issue common to all is whether under 18 U.S.C. § 1161[1] the states or the Indian tribes have licensing and distribution jurisdiction over

---

1. 18 U.S.C. § 1161 Application of Indian Liquor Laws

The provisions of sections 1154, 1156, 3113, 3488, and 3618, of this title shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register.

Added Aug. 15, 1953, c. 502, § 2, 67 Stat. 586.

Indian country liquor transactions. We conclude that under section 1161 the tribes have exclusive jurisdiction to license and distribute liquor on the reservation.

In No. 77–2409 (*Rehner*), Eva Rehner, a federally licensed Indian trader who owns and operates a small general store on the Pala Reservation in California, sought exemption from California law requiring a state license for retail sale of distilled spirits for off-premises consumption. The Pala Band of Mission Indians had adopted an ordinance permitting the sale of intoxicating beverages provided that such sales were in conformity with the laws of California. The Secretary of the Interior certified the ordinance as required under section 1161. When the California Department of Alcoholic Beverage Control rejected Mrs. Rehner's request for an exemption, she brought an action in district court for declaratory and injunctive relief. The district court dismissed her action for failure to state a claim. It concluded that Mrs. Rehner was required to obtain a license from the State of California before she could lawfully engage in the sale of distilled spirits. She appeals.

In Nos. 79–4403 and 79–4404 (*Muckleshoot* and *Tulalip*), the State of Washington seized liquor in interstate commerce destined for the Muckleshoot and Tulalip Indian reservations in Washington where the two tribes maintain retail liquor stores. Washington had assumed criminal and civil jurisdiction pursuant to Public Law 280 [2] (Pub.L.280) over the Muckleshoot and Tulalip Indian Tribes in 1957 and 1958, respectively.[3] The tribal liquor stores are operated pursuant to tribal ordinances enacted under authority granted by 18 U.S.C. § 1161 (1976), which permits reservation sales of liquor by Indian tribes when such sales do not otherwise contravene state or tribal law. Both ordinances were approved by the Bureau of Indian Affairs and certified by the Secretary of the Interior as required under section 1161.[4]

Under these ordinances, no sales of liquor are permitted on the reservations except through stores owned and operated by the tribal governments. The principal objectives of the ordinances are to regulate the sale of liquor on the reservations and to generate revenue for the tribes. The distribution of liquor in the tribal stores is consistent with state standards of conduct applicable to liquor transactions but the tribes have never applied for licensing from the Washington State Liquor Control Board [the Board]. Consistent with their authority under section 1161, the tribes contracted with the Central Liquor Company, a federally licensed distributor located in Oklahoma City, Oklahoma, for the sale of liquor to the tribes. In November and December of 1978, however, agents of the Board seized liquor moving in interstate commerce from the Central Liquor Company to the Muckleshoot and Tulalip Tribes.

Washington seized the liquor contending that its monopoly on the sale of liquor extended to Indian country.[5] Aside from tribal liquor stores, Washington, through the Board, maintains an absolute monopoly on the sale of liquor within the state. Revenue earned through this state monopoly is

---

**2.** Public Law 280 is the name commonly given to the Act of August 15, 1953, ch. 505, 67 Stat. 588.

**3.** *See* Wash.Rev.Code Ann. § 37.12.010 et seq. (1962).

**4.** The Muckleshoot ordinance provides:

Tribally authorized liquor transactions shall comply with Washington State liquor law standards to the extent required by 18 U.S.C. 1161.

*Muckleshoot Liquor Ordinance*, § 7. 43 Fed. Reg. 26,516 (1978).

The Tulalip ordinance provides:

Nothing herein contained shall be construed to supercede the substantive laws of the State of Washington effective within the exterior boundaries of the Tulalip Indian Reservation and, where not inconsistent herewith, the substantive standards of the criminal laws of the State of Washington regarding sale, consumption and use of liquor shall apply.

*Tulalip Ordinance No. 43*, § 12, 42 Fed.Reg. 46,612 (1977).

**5.** Both the Muckleshoot and Tulalip reservations are within Indian country as defined in 18 U.S.C. § 1154 and 1161.

distributed to local governments; none is distributed to the tribes.

The tribes brought actions in federal district court seeking injunctive relief and Washington counterclaimed, seeking injunctive and monetary relief. The district court held: (1) the tribes exercise exclusive regulatory jurisdiction under 18 U.S.C. § 1161 over liquor sales on the reservation; (2) the twenty-first amendment did not expand the States' jurisdiction over liquor sales on Indian reservations; and (3) Washington's counterclaim was without merit. Washington appeals all three rulings.

## I

■ Two canons of construction have been applied to statutes affecting Indian immunities. First, ambiguities in statutes relating to Indians are to be resolved in favor of the Indians. *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 208 n.17, 98 S.Ct. 1011, 1020 n.17, 55 L.Ed.2d 209 (1978); *Bryan v. Itasca County*, 426 U.S. 373, 392, 96 S.Ct. 2102, 2112, 48 L.Ed.2d 710 (1976); *DeCoteau v. District County Court*, 420 U.S. 425, 444, 95 S.Ct. 1082, 1092, 43 L.Ed.2d 300 (1975). Second, state jurisdiction over reservations, historically, is strongly disfavored. The Supreme Court has emphasized that the policy of leaving Indians free from state jurisdiction is deeply rooted in the nation's history. *Bryan*, 426 U.S. at 376 n.2, 96 S.Ct. at 2105 n.2; *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 168, 93

S.Ct. 1257, 1260, 36 L.Ed.2d 129 (1973). Moreover, the Supreme Court has stated that "[s]tate laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply." *Bryan*, 426 U.S. at 376 n.2, 96 S.Ct. at 2105, n.2, quoting *McClanahan*, 411 U.S. at 170–71, 93 S.Ct. at 1261–62. In view of this, we conclude that there is insufficient evidence to show that Congress intended section 1161 to confer on the states regulatory jurisdiction over on-reservation liquor traffic.

The federal government has long exercised pervasive and exclusive control over Indian liquor transactions [6] through its authority under the Indian commerce clause,[7] and Article II, section 2 of the United States Constitution.[8] *See McClanahan*, 411 U.S. at 173, 93 S.Ct. at 1262–63.

In consideration of the history of exclusive federal control, the district court in *Muckleshoot* and *Tulalip* observed that unless section 1161 expressly authorizes state jurisdiction over liquor transactions in Indian country, there could be no ground for concluding that Congress has removed its veil of preemption. It did not find such an authorization.

Our review of section 1161 and its legislative history, together with an appraisal of other relevant statutes and administrative and judicial constructions of section 1161, confirms that conclusion.

**6.** Congress has manifested its intent to preempt this subject matter through a long sequence of statutes regulating Indian liquor transactions. In 1802, the President was authorized to prevent the sale or distribution of liquor among the Indian tribes. Act of March 30, 1802, § 21, 2 Stat. 139, 146. In 1832, Congress made the introduction or sale of liquor on the reservation a federal crime. Act of July 9, 1832, § 4, 4 Stat. 564. To aid in the enforcement of Indian liquor laws, Congress made possession of liquor in Indian country an independent federal offense in 1918, and subsequently has limited liquor in areas adjacent to reservations and within territory ordinarily considered to be outside Indian country. *See* Act of May 25, 1918, 40 Stat. 561, 563; *see generally* F. Cohen, *Handbook of Federal Indian Law* 353 (1942). Congress has also prohibited distilleries in Indian country. 25 U.S.C.

§ 251 (1976). Until 1953, Congress continued its absolute prohibition on the introduction, possession and sale of liquor in Indian country. *See* 18 U.S.C. §§ 1154, 1156 (1976). Although these prohibitions remain in effect, they are inapplicable to congressionally authorized liquor transactions in Indian country under 18 U.S.C. § 1161 (1976).

**7.** The Indian commerce clause provides: "The Congress shall have power to regulate commerce ... with the Indian Tribes." U.S. Const. Art. 1, § 8, cl. 3.

**8.** That provision provides in part: "[The President] shall have power, by and with the advice and consent of the Senate, to make treaties, providing two thirds of the Senators present concur ...." U.S. Const. Art. II, § 2, cl. 1.

### A.

Washington and California argue that 18 U.S.C. § 1161 does not preempt the imposition of state distributive and licensing jurisdiction in Indian country. In reviewing this contention, we turn first to the language of the statute. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 337, 99 S.Ct. 2326, 2330, 60 L.Ed.2d 931 (1979). Section 1161 provides:

> The provisions of sections 1154, 1156, 3113, 3488, and 3618, [federal statutes establishing criminal sanctions and procedures for Indian country liquor violations] of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction *is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country*, certified by the Secretary of the Interior, and published in the Federal Register.

18 U.S.C. § 1161 (1976) (emphasis added). Washington and California contend that, through section 1161, Congress delegated regulatory authority over reservation liquor transactions to the states. They argue that the language delegating such power is identical with respect to the tribes and to the state: Liquor transactions must be "... in conformity *both* with the laws of the state in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country ...." (emphasis added). According to Washington and California, section 1161 requires the tribes not only to conform with substantive standards such as hours of operation and legal age for consumption, but also to observe and respect state requirements relating to the distribution and licensing of liquor.

Quite plainly an ambiguity in construction exists, for the language of section 1161 suggests a contrary result to us. We agree with Washington that the statute's key clause requires liquor transactions to be "in conformity with both the laws of the state in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country ...." Our agreement ends here, however. Washington places an inordinate emphasis on the isolated phrase "laws of the State", and concludes that state "law" includes exclusive jurisdiction to license and distribute.

Even if such a narrow focus on the phrase "laws of the State" apart from its context were justified, we would reach the opposite conclusion. Because the adjective "both" is distributive with regard to the phrases "laws of the State" and "ordinance duly adopted by the tribe", each phrase is equivalent and coextensive within the structure of the sentence. If we were to assume, as Washington does, that the phrase "laws of the State" implicitly permits exclusive state licensing and distribution jurisdiction, the grammatical logic of the statute would likewise require the implicit inclusion of a similar jurisdictional component in the phrase "ordinance duly adopted by the tribe ...." Washington's reading thus yields the unlikely result that a licensing and distribution monopoly could vest in both the state and the tribes. There is no basis in the statute's structure for assuming that Congress intended courts to read a jurisdictional component into the phrase "laws of the State" and simultaneously to ignore the similar opportunity presented by the phrase "ordinance duly adopted by the tribe." Moreover, the finding of an implicit recognition of jurisdiction in the phrase "ordinance duly adopted by the tribe", is more tenable than the finding of an implicit grant of jurisdiction in the phrase "laws of the State," because grants of state jurisdiction over reservation Indians must be express, not implied. *Bryan*, 426 U.S. at 390, 96 S.Ct. at 2111. Tribal power over internal affairs, on the other hand, is inherent and may exist without a grant from Congress. *United States v. Wheeler*, 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978); *see Washington v. Confederated Tribes of the Colville Reservation*, 447 U.S. 134, 152–54, 100 S.Ct. 2069, 2080–82, 65 L.Ed.2d 10 (1980).

In any event, Washington's focus is too restricted. The phrases "laws of the State" and "ordinance duly adopted by the tribe" must be read in light of the clauses modifying them. We note first that section 1161 is not cast in the form of a jurisdictional grant to anyone; it simply provides for the inapplicability of certain federal criminal statutes under specified conditions. Moreover, the specific clauses relied upon by the state do not support the implications the state would draw from them. The relevant language in section 1161 includes "laws of the State *in which such act or transaction occurs*" and "ordinance duly adopted by the tribe *having jurisdiction over such area of Indian country*". When presented in full, the clauses in section 1161 distributed by the word "both" yield a content inconsistent with Washington's thesis. Although the phrase "ordinance duly adopted by the tribe" is specifically modified by the word "jurisdiction", there is no corresponding jurisdictional adjective in section 1161 defining the scope of the "laws of the State". On the contrary, the phrase directly modifying "laws of the State"—"in which such act or transaction occurs"—contains no jurisdictional inference. Had Congress so intended, it could have captured the meaning of the clause modifying "laws of the State", while at the same time ceding jurisdiction to the states, by substituting the phrase "having jurisdiction over such act", for the phrase "in which such act or transaction occurs", and deleting the present reference to *tribal* jurisdiction. If Congress intended to confer jurisdiction over Indian liquor transactions to the states, it could have expressly so stated. *See Bryan*, 426 U.S. at 390, 96 S.Ct. at 2111.

A close reading of the statute then, reveals that Congress recognized the tribes' jurisdiction over liquor transactions, with the state functioning only as the source of law to be applied by the tribal government. This meaning is supported by the statute's syntax as well as the language modifying the references to state law and tribal ordinances.

### B.

A comparison of section 1161 with statutes that are related to or *in pari materia*[9] with it also supports our conclusion that the tribes have distribution and licensing jurisdiction. We first compare section 1161 with Pub.L. 280 and the Termination Acts[10] because both sets of legislation are *in pari materia* with section 1161. We then review the legislative history of section 1161 and Pub.L. 280, as well as related statutes—the Assimilative Crimes and Major Crimes Acts.

The Termination Acts are replete with language expressly conferring *jurisdiction* upon the states. Vague reference to the "laws of the State", as found in section 1161, was never assumed to suffice as a grant of jurisdiction.[11] Similarly, a congressional intent simply to apply state standards or "laws of the State" in section 1161, standing alone, is insufficient to confer jurisdiction.

---

9. "Statutes are considered to be *in pari materia* —to pertain to the same subject matter—when they relate to the same person or thing, or to the same class of persons or things, or have the same purpose or object." *See* J. Sutherland, *supra*, § 51.03 at 298. The Termination Acts, Pub.L. 280 and section 1161 are statutes regarding the applicability of state law in Indian country and must therefore be considered *in pari materia* and construed together. *See Bryan*, 426 U.S. at 389–390, 96 S.Ct. at 2111–12.

10. In 1953, Congress adopted the goal of termination of the special relationship between the federal government and the Indian tribes. Over the following 15 years, the relationship with over 100 tribes was terminated.

11. *See, e.g.,* 25 U.S.C. § 726 (1976) ("[o]n and after the date of the proclamation to be issued in accordance with the provisions of section 722 of this title, all statutes of the United States which affect Indians because of their status as Indians shall no longer be applicable to the Alabama and Coushatta Tribes of Texas or the members thereof, except as provided in said section *and the laws of the several states shall apply to the tribe and its members in the same manner as they apply to other citizens or persons within their jurisdiction*") (emphasis added); *see also* language identical to that emphasized here in 25 U.S.C. §§ 757(a) and 899.

Like the Termination Acts, Pub.L. 280 illustrates clearly that Congress knew how to employ precise language when it wished to transfer jurisdiction over Indian country to the states. Although Pub.L. 280 and section 1161 are related in subject matter, there is a conspicuous disparity in language between the two statutes.[12] In contrast to section 1161, Pub.L. 280 expressly grants civil and criminal *jurisdiction* to the states. In so doing, Congress expressed its intent with words similar to those employed in its reference to jurisdiction of the tribes in section 1161. *Compare* 18 U.S.C. § 1162(a) ("Each of the states . . . *shall have jurisdiction* over offenses . . . .") (emphasis added) and 28 U.S.C. § 1360(a) ("Each of the states . . . *shall have jurisdiction* over civil causes of action . . . .") (emphasis added) *with* 18 U.S.C. § 1161 ("ordinance duly adopted by the *Tribe having jurisdiction* . . . .") (emphasis added). There is no language in section 1161 indicating that the states were granted jurisdiction over Indian country liquor transactions.

In light of this repeated choice of terminology, Washington cannot merely point to the phrase "laws of the State" in section 1161 and infer that Congress intended a wholesale conferral of jurisdiction upon the states. When Congress extended jurisdiction to the states in Pub.L. 280, it not only expressly granted *jurisdiction*, but also classified and defined its grant as either *criminal* or *civil* jurisdiction. In contrast, section 1161 contains neither an express grant of jurisdiction to the State nor any definition of such jurisdiction as either civil, criminal or regulatory. *See Bryan*, 426 U.S. at 383–93, 96 S.Ct. at 2108–2113.

It is helpful to contrast the phrase "shall have jurisdiction" of Pub.L. 280, with the phrase "laws of the State" of section 1161. The conclusion that "laws of the State" refers to state standards of conduct, and not to jurisdiction, is compelled. In enacting Pub.L. 280, Congress carefully and explicitly differentiated between "jurisdiction" and substantive "laws" because it intended to incorporate state substantive law *and* state jurisdiction. *See* 18 U.S.C. § 1162(a) ("Each of the states . . . shall have *jurisdiction* over offenses . . . and the criminal *laws* of such state . . . shall have the same force and effect within . . . Indian country as . . . elsewhere . . . .") (emphasis added); 28 U.S.C. § 1360(a) ("Each of the states . . . shall have *jurisdiction* over civil causes of action . . . and those *civil laws* . . . of general application . . . shall have the same force and effect within . . . Indian country as . . . elsewhere . . . .") (emphasis added).

A close examination of Pub.L. 280 reveals, then, that when Congress has extended state jurisdiction over Indian country it has done so affirmatively by using precise language, not by oblique reference to state law.[13] Accordingly, we find that Congress did not grant licensing and distribution jurisdiction in section 1161 when it spoke with language that would have been inadequate to confer jurisdiction under Pub.L. 280. This distinction between substantive and regulatory law is at the heart of the Court's holding in *Bryan*. The Court found that although Congress ceded civil and criminal jurisdiction to the states through Pub.L. 280, it did not express an intent to grant the state regulatory jurisdiction to tax. *Bryan*, 426 U.S. at 379–93, 96 S.Ct. at 2106–13.

Perhaps the most compelling feature of section 1161's legislative history is the complete absence of any discussion concerning state licensing and distribution jurisdiction over liquor. In *Bryan*, the Supreme Court found the absence of legislative history fatal to the claim that Pub.L. 280 conferred

---

12. At trial, Washington argued that Pub.L. 280 conferred licensing and distribution jurisdiction to the state. Washington has apparently abandoned the issue on appeal. *See Bryan*, 426 U.S. at 390–93, 96 S.Ct. at 2111–13 (Pub.L. 280 does not confer regulatory jurisdiction upon the States).

13. *See Bryan*, 426 U.S. at 383–93, 96 S.Ct. at 2108–13 (Court refuses to read Pub.L. 280 as a grant of regulatory jurisdiction to the states because Congress did not expressly extend "regulatory" as opposed to "criminal" or "civil" jurisdiction).

upon the states regulatory jurisdiction to tax. *Bryan*, 426 U.S. at 380, 96 S.Ct. at 2107; *see Kennerly v. District Court of Ninth Judicial Dist. of Mont.*, 400 U.S. 423, 426–27, 91 S.Ct. 480, 481–82, 27 L.Ed.2d 507 (1971) (Congress consistently gives proposed extensions of state jurisdiction over reservation Indians "comprehensive and detailed . . . scrutiny"); *Santa Rosa Band of Indians v. King's County*, 532 F.2d 655, 661 (9th Cir. 1975), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 731, 50 L.Ed.2d 748 (1977).

The proposition that section 1161 incorporates only state substantive standards and not state licensing and distribution jurisdiction is also supported by comparing section 1161 with the Assimilative Crimes Act, 18 U.S.C. § 13 (1976), and the Major Crimes Act, 18 U.S.C. § 1153 (1976). Under the Assimilative Crimes Act, federal prosecutions of interracial offenses are effected by assimilating substantive state law to fill the gaps of federal law, but no state jurisdiction is involved.[14] *See United States v. Brown*, 608 F.2d 551, 553 (5th Cir. 1979). The act provides:

Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, is *guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State*, Territory, Possession, or District in *which such place is situated, by the laws thereof* in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13 (1976) (emphasis added).

Under the Major Crimes Act, the federal courts have jurisdiction over certain offenses committed by Indians against Indians and non-Indians in Indian country. The laws of the state in which the Indian country is situated are incorporated for the crimes of burglary and incest, as well as other state laws which have no federal counterparts. No state jurisdiction, however, is involved. *See Youngbear v. Brewer*, 549 F.2d 74, 75–76 (8th Cir. 1977). The act provides in part:

As used in this section, the offenses of burglary and incest shall be defined and punished *in accordance with the laws of the State in which such offense was committed* as are in force at the time of such offense.

In addition to the offenses of burglary and incest, any other of the above offenses which are not defined and punished by Federal law in force within the exclusive jurisdiction of the United States shall be defined and *punished in accordance with the laws of the State in which such offense was committed as are in force at the time of such offense.*

18 U.S.C. § 1153 (1976) (emphasis added).

The Assimilative Crimes Act and the Major Crimes Act illuminate the function we believe Congress meant state law to perform in section 1161. Although both Crimes Acts require the incorporation of state law in adjudicating certain criminal offenses, this express requirement of incorporation clearly does not compel the incorporation as well of jurisdiction to enforce and administer those state laws.[15] Rather than create a new body of federal criminal law, Congress decided under these Acts to incorporate state substantive law. Federal courts, however, retain jurisdiction over the

14. 18 U.S.C. § 1152 makes the Assimilative Crimes Act applicable to crimes committed by non-Indians against Indians and non-major crimes of Indians against non-Indians.

15. Although Washington failed to raise the issue at trial, it argues on appeal that its liquor monopoly is itself a substantive standard of conduct designed to discourage liquor consumption. Because the issue is primarily one of fact, we refuse to entertain it for the first time on appeal. *See Sgro v. United States*, 609

F.2d 1259, 1264 n.8 (7th Cir. 1979); *Seymour v. Coughlin Co.*, 609 F.2d 346, 348–49 (9th Cir. 1979), *cert. denied* 446 U.S. 957, 100 S.Ct. 2929, 64 L.Ed.2d 816 (1980). In any event, section 1161 would not countenance such a circuitous scheme. Under section 1161, the states are free to legislate restrictions on Indian country liquor transactions directly by promulgating substantive restrictions. Extension of state licensing and distribution jurisdiction would be unnecessary to effect these restrictions.

offenses. Nothing in section 1161 indicates that its language is to be differentiated substantively from that used in either of these Acts. Although the purpose behind incorporating substantive state law might vary among these statutes,[16] Congress in enacting section 1161 appears to have adopted the convenient technique it had employed in drafting the Assimilative Crimes Act and the Major Crimes Act.

Having reviewed the relevant statutes and legislative history, we find no reason to depart from the view we expressed upon first reading the statute: section 1161 grants the states no jurisdiction to license or distribute liquor in Indian country. We next turn to the applicable precedents and administrative constructions.

## C.

We have kept in mind the canons of construction, mentioned earlier in the opinion, to be applied to statutes affecting Indian immunities. Ambiguities are resolved in favor of the Indians, state jurisdiction over reservations is strongly disfavored, and state laws will be applied only where Congress has expressly so provided. In view of this, we conclude that there is insufficient evidence to show that Congress intended section 1161 to confer on the states regulatory jurisdiction over on-reservation liquor traffic.

Our conclusion is supported by recent Supreme Court decisions that suggest that section 1161 preempts state licensing and distribution jurisdiction in Indian country. The Court examined tribal regulatory authority over liquor transactions in *United States v. Mazurie,* 419 U.S. 544, 95 S.Ct. 710, 42 L.Ed.2d 706 (1975). That section 1161 does not unambiguously confer regula-

tory jurisdiction on the states is indicated by the Supreme Court's description of that statute as "allowing Indian tribes . . . to regulate the introduction of liquor into Indian country, as long as state law was not violated." *Id.* at 547, 95 S.Ct. at 713. That description suggests that regulatory authority was vested in the tribes. Although we do not find it necessary to determine whether inherent tribal sovereignty independently excludes state licensing and regulatory jurisdiction, we are obligated to incorporate the principle of tribal sovereignty into our preemption analysis. *McClanahan,* 411 U.S. at 179, 93 S.Ct. at 1266. As a consequence, the usual Indian preemption presumptions favoring exclusion of state jurisdiction, especially state regulatory jurisdiction, are weighted even more favorably toward the tribes in this case.

As previously noted, the Supreme Court demonstrated its reluctance to imply grants of regulatory jurisdiction to the states in *Bryan, supra.* There, the Court held that although Pub.L. 280 conferred civil and criminal jurisdiction to the states, it did not confer jurisdiction to tax.

The Court summarized its determination in *Bryan* by observing that "if Congress in enacting Pub.L. 280 had intended to confer upon the States general civil regulatory powers, including taxation, over reservation Indians, it would have expressly said so." 426 U.S. at 390, 96 S.Ct. at 2111–12. Although this identical principle motivates our conclusion that section 1161 does not confer licensing and distribution jurisdiction upon the states, we are also persuaded by what Congress *did* express in section 1161 about regulatory authority. No tribal ordinance is effective unless "certified by the Secretary of the Interior, and published

---

**16.** Incorporation of state law under section 13 and section 1153 was a convenient method of filling the gaps in federal law. *See generally* D. Getches, D. Rosenfelt and C. Wilkinson, *Federal Indian Law* 370, 375 (1979). A more substantive concern may have motivated Congress to adopt the same method in section 1161: An intent to ensure that dry States would be able to remain dry by entirely "restricting" liquor sales within and without Indian country. *See* S.Rep. No. 722, 83rd Cong., 1st Sess. *reprinted*

in [1953] *U.S.Code Cong. & Ad.News* 2399–2400. Consistent with sections 13 and 1153, however, this possible purpose behind incorporating state law under section 1161—to allow states to "restrict" Indian and non-Indian liquor sales—could be achieved by merely incorporating state standards. There would hardly be a need to extend state licensing and distribution jurisdiction over Indian country liquor transactions if such traffic was proscribed by the state law.

in the Federal Register". 18 U.S.C. § 1161. Through this language, Congress indicated that the regulatory authority of the tribes which was the subject of § 1161 was safeguarded by federal supervision. We are therefore presented with a congressional scheme in which comprehensive tribal ordinances and Department of Interior certification procedures are "in themselves sufficient to show that Congress has taken ... business ... so fully in hand that no room remains for state laws imposing additional burdens ...." *Warren Trading Post v. Arizona State Tax Commission*, 380 U.S. 685, 689–691, 85 S.Ct. 1242, 1244–46, 14 L.Ed.2d 165 (1965).

In *United States v. New Mexico*, 590 F.2d 323, 327–29 (10th Cir. 1978), *cert. denied*, 444 U.S. 832, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979), the Tenth Circuit faced the issue we decide today: Whether section 1161 delegates to the states authority to regulate Indian country liquor transactions. After tracing the Supreme Court's recent decisions, including *Bryan, Moe v. Confederated Salish and Kootenai Tribes of Flathead Indian Reservation*, 425 U.S. 463, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976), *McClanahan v. Arizona State Tax Commission, supra*, and *Warren Trading Post, supra*, the Tenth Circuit concluded that "Congress may delegate [regulatory] authority to the state, but when it does so it must be in specific terms. Section 1161 ... does not delegate this authority either expressly or impliedly." 590 F.2d at 328.[17]

We agree with the Tenth Circuit that the Supreme Court's recent precedents require a conclusion that section 1161 preempts[18]

state licensing and distribution jurisdiction in Indian country.

## II

■ Although we have concluded that neither Washington nor California has regulatory jurisdiction to license liquor transactions or distribute liquor in Indian country, the district court must determine in *Muckleshoot* and *Tulalip* whether Washington can impose a sales tax on Indian country liquor transactions. Because the Court below did not have available the Supreme Court's opinion in *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), we reverse and remand for proceedings consistent with that opinion.

Although Washington concedes that, under *Moe v. Salish & Kootenai Tribes*, 425 U.S. at 475–481, 96 S.Ct. at 1642–1645, it has no power to tax tribal sales to tribal members, it argues that *Colville* permits state taxation of retail sales to non-tribal members, even though the class of non-tribal members includes Indians.

The district court apparently sought to avoid resolution of the state sales tax issue; nevertheless, it granted an injunction against further off-reservation state liquor seizures. *Colville* indicates, however, that an injunction against state off-reservation seizures is improper without a determination that the state tax is invalid. *Colville*, 447 U.S. at 161–62, 100 S.Ct. at 2085–86. Two other issues were resolved in *Colville*. First, the Court found that state taxation of sales to non-tribal members, whether In-

---

**17.** Although New Mexico, unlike Washington, is not a Pub.L. 280 state, no distinction relevant to this case can be derived from that difference since only regulatory jurisdiction is implicated in this appeal. *See Bryan*, 426 U.S. at 383–393, 96 S.Ct. at 2108–13 (Congress did not confer regulatory jurisdiction on the states through Pub.L. 280). As we have indicated, the legislative history of Pub.L. 280 demonstrates that Congress contemplated extending liquor jurisdiction to the states under Pub.L. 280 but rejected the provision that would have done so. See discussion at pp. 1350–1351, *infra*.

**18.** A state's exercise of jurisdiction over reservation Indians is invalid not only if it conflicts with federal preemption but also if it infringes on Indian self-government. These are independent (although related) barriers to state authority. *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 142–43, 100 S.Ct. 2578, 2583, 65 L.Ed.2d 665 (1980). In view of our determination that section 1161 has preemptive effect, and because neither Washington nor the tribes have directly addressed the question whether state licensing or distribution jurisdiction *infringes* on tribal self-government, we do not reach the infringement issue.

dian or non-Indian, was neither preempted nor contrary to principles of tribal self-government. *Colville*, 447 U.S. at 154–59, 100 S.Ct. at 2081–84. Second, the Court held that a state's interest in enforcing its valid sales tax was sufficient to justify its seizure of cigarette shipments travelling to the reservation from out-of-state wholesalers if the tribes failed to comply with state collection procedures. *Id.* at 161–62, 100 S.Ct. at 2085–86. Consequently, although the court below did not directly address the tax issue, its grant of injunctive relief implicitly presumed the invalidity of the state sales tax. Because the district court did not conduct the inquiry mandated by *Colville* prior to granting the injunction, we must reverse. Without an initial determination whether the sales tax is invalid, a grant of permanent injunctive relief is premature.

Beyond reversing the district court's grant of permanent injunctive relief, we are unable to intimate any opinion on the merits of the following questions: (1) whether Washington's sales tax on sales to non-tribal members, with or without credit given to tribal sales taxes, is preempted or violative of tribal self-government; or (2) whether Washington may impose record-keeping requirements upon the tribes pursuant to the valid state taxing power, if any. Resolution of these and related questions will await full hearing on remand.

### III

■ Washington also contends that the twenty-first amendment to the United States Constitution enlarges its jurisdiction over reservation liquor transactions. That amendment provides in part:

The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited.

U.S. Const. amend. XXI, § 2.

There is little to commend the State's contention. *See United States v. New Mexico*, 590 F.2d 323, 329 (10th Cir. 1978), *cert. denied*, 444 U.S. 832, 100 S.Ct. 63, 62 L.Ed.2d 42 (1979), (summarily dismissing New Mexico's contention that the twenty-first amendment permits state liquor licensing on Indian reservations). As we have indicated, section 1161 does not expand a state's regulatory jurisdiction over tribal liquor sales in Indian country. Even if jurisdiction over reservation liquor transactions could be characterized as "concurrent", the Supreme Court has flatly held that neither "exclusive" nor "concurrent" jurisdiction federal enclaves are subject to state regulation by force of the twenty-first amendment. *United States v. State Tax Commission of Mississippi*, 421 U.S. 599, 613–14, 95 S.Ct. 1872, 1880–81, 44 L.Ed.2d 404 (1975).

The state's argument is also susceptible to a more fundamental criticism. Washington's Pub.L. 280 jurisdiction over the tribes is criminal and civil: Pub.L. 280 does not grant regulatory jurisdiction over the tribes. *Bryan*, 426 U.S. at 389, 96 S.Ct. at 2111. Even if the distinction between "concurrent" and "exclusive" jurisdiction were valid in this context, the state could not claim that its jurisdiction is concurrent because Pub.L. 280 is not a grant of regulatory jurisdiction to the states, and it is regulatory jurisdiction that is at issue in this case.

### IV

In *Muckleshoot* and *Tulalip*, Washington asserts that its counterclaims for injunctive relief and damages are not barred by the doctrine of tribal sovereign immunity and argues that because its claim was compulsory, it needs no independent jurisdictional basis to sue the tribes. Washington also claims that jurisdiction for the counterclaim could be grounded on section 1161 and the twenty-first amendment. It further contends that the tribes waived their sovereign immunity by bringing an action for injunctive relief and that injunctive relief against a sovereign is not affirmative relief of the type barred by sovereign immunity when such relief is the logical concomitant of the court's power to issue declaratory relief. It is also suggested that the monetary relief Washington seeks can be justified on a similar basis. Finally, Washington argues that

under *Land v. Dollar*, 330 U.S. 731, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947), traditional concepts of sovereign immunity do not apply when the sovereign is in unlawful possession of another's property; because the tribes may be viewed as the constructive trustee for Washington of all money received from the sale of liquor, traditional principles of sovereign immunity are inapplicable in this case.

The district court ruled in favor of the tribes on their motion for summary judgment. It did not, however, reach the issue of tribal sovereign immunity. Nevertheless, because the question of sovereign immunity is jurisdictional in nature we are obligated to resolve it irrespective of the merits of Washington's counterclaim. *See People of the State of California ex rel. California Department of Fish and Game v. Quechan Tribe of Indians*, 595 F.2d 1153, 1154 (9th Cir. 1979).

The immunity of the tribes is coextensive with that of the United States. Neither can be sued without congressional or tribal consent and such consent must be unequivocally indicated. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59–60, 98 S.Ct. 1670, 1677–1678, 56 L.Ed.2d 106 (1978); *Quechan Tribe of Indians*, 595 F.2d at 1155; *Sekaquaptewa v. MacDonald*, 591 F.2d 1289, 1291 (9th Cir. 1979); *United States v. Oregon*, 657 F.2d 1009, 1012–13 (9th Cir. 1981). Nothing on the face of section 1161 purports to subject the tribes to suits for declaratory or injunctive relief. *See Martinez*, 436 U.S. at 59–60, 98 S.Ct. at 1677–1678. These principles also preclude counterclaims. *See United States v. United States Fidelity & Guaranty Co.*, 309 U.S.

506, 512–13, 60 S.Ct. 653, 656–657, 84 L.Ed. 894 (1940); *United States v. City of Los Angeles*, 595 F.2d 1386, 1389 (9th Cir. 1979). The present case does not fall within the *Land v. Dollar* exception to sovereign immunity, which is only activated when the claim is to property the sovereign wrongfully holds without any title. 330 U.S. at 737–738, 67 S.Ct. at 1012–1013. The tribes are not agents or officers of the United States. We therefore find Washington's counterclaim barred by the doctrine of tribal sovereign immunity.[19]

V

In summary, we conclude that 18 U.S.C. § 1161 preempts state licensing and distribution jurisdiction over tribal liquor sales in Indian country. The effect of our holding in 77–2409 is that so long as Mrs. Rehner complies with the certified tribal ordinance authorized by 18 U.S.C. § 1161, she need not obtain a California license to sell liquor in Indian country. The judgment in 77–2409 is reversed.

In *Muckleshoot* and *Tulalip*, however, we must remand to the district court for a determination whether, and under what circumstances, Washington may impose a tax on tribal liquor sales to non-tribal members. We therefore reverse the district court's grant of injunctive relief to the tribes. We affirm, however, the trial court's conclusion that the twenty-first amendment does not expand the state's regulatory jurisdiction over reservation liquor transactions. We also find that Washington's counterclaims are barred by the doctrine of tribal sovereign immunity. The judgments in 79–4403 and 79–4404 are affirmed in part and re-

**19.** We further reject Washington's contention that, by suing for injunctive relief, the tribes waived their sovereign immunity and consented to suit. In *United States v. Oregon*, 657 F.2d 1009 (9th Cir. 1981), we held that an Indian tribe had manifested its consent to suit by intervening as a party plaintiff in a suit by the United States against Oregon to establish the fishing rights of all Indian tribes occupying the Columbia River basin. The Indian tribe voluntarily intervened in the original action, which resembled an equitable action *in rem*, to establish and to protect its treaty fishing rights. In

this posture the court necessarily had authority to issue orders directed to the tribes, so that it could retain control over the subject litigation. The tribes' suit here does not manifest such broad, voluntary consent. The Muckleshoot and Tulalip tribes were forced to seek injunctive relief in court after Washington had seized liquor bound for the reservations. This cannot constitute a waiver of the tribes' sovereign immunity against counterclaims for injunctive or monetary relief. A state cannot compel a waiver of tribal sovereign immunity simply by seizing goods owned by the tribes.

versed in part and remanded for proceedings not inconsistent with this opinion.

GOODWIN, Circuit Judge, dissenting.

The result reached by the majority appears to be equitable. It evidences a scholarly approach to some complex issues of divided sovereignty, but the decision seems not to be consistent with either the text of the relevant law or legislative history.

When the Twenty-First Amendment repealed the federal criminal penalties for the sale of liquor the amendment took care to protect the regulatory interests of the several states. United States Constitution, Amendment XXI, Section 2 (1933). Some states chose to remain "dry."

All Indian country remained dry by federal law; and for the next twenty years it remained a crime for anyone to sell liquor in Indian country. See 18 U.S.C. § 1154.

When Congress, in 1953, conditionally lifted the criminal penalties which had been imposed upon the liquor traffic among Indians it gave Indians some kind of parity with the nation's citizens who are not Indians. Congress indicated no intent to give Indians greater rights than other citizens enjoy with regard to liquor.

Congress took care to lift the criminal penalty only so long as the newly legalized "transactions" would be in conformity with all state laws. 18 U.S.C. § 1161. All the discussion in the majority opinion about "conferring" or "not conferring" jurisdiction upon the states is interesting but seems unresponsive to the purpose of the statute.

The statutory language is the most troublesome in four states within this circuit: Washington, Oregon, Idaho, and Montana, so-called monopoly states. Washington since 1933 has made contraband all liquor that is not in conformity with RCWA 66.-32.010 [1]

Under the majority decision, Indians whose reservations lie within the boundaries of the State of Washington will have the status of super citizens. They, and they alone, can buy and import at free market prices any liquor they desire. All other citizens of the State of Washington who desire to purchase liquor must join the queue at the government store and select from a monopoly inventory at a monopoly price. Washington shares with Oregon some of the nation's highest retail liquor prices. (Alaska enjoys the highest prices.) Washington has a special 15 percent state sales tax on liquor sold in state stores. Other monopoly states simply take their monopoly profit in lieu of taxes. The Distilled Spirits Council of the United States publishes periodic price information for the trade. According to the Council's report for the last half of 1981, a popular blended American whiskey which sells for an average retail price of $5.60 per ml. in Arkansas and $6.25 in California sells for $7.20 in Washington.[2] I doubt that Congress intended by § 1161 to pave the way for one favored group of citizens to break the state monopolies that are so cherished by money hungry legislatures.

On the merits, this policy may be an idea whose time has come, but I would leave its implementation to the legislative branch. I would affirm No. 77–2409 and vacate No. 79–4403 and No. 79–4404.

1. RCWA 66.32.010:
   "Except as permitted by the board, no liquor shall be kept or had by any person within this state unless the package in which the liquor was contained had, while containing that liquor, been sealed with the official seal adopted by the board, except in the case of:
   (1) Liquor imported by the board; or
   (2) Liquor manufactured in the state for sale to the board or for export; or
   (3) Beer, purchased in accordance with the provisions of law; or
   (4) Wine or beer exempted in RCW 66.12.-010.

2. Distilled Spirits Council of the United States, Incorporation, Economics and Statistics Division, December 17, 1981.