RICE, DIRECTOR, DEPARTMENT OF ALCOHOLIC
BEVERAGE CONTROL OF CALIFORNIA
*v.* REHNER

No. 82–401.   Argued March 21, 1983—Decided July 1, 1983

*Alan S. Meth,* Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *John K. Van De Kamp,* Attorney General, and *George Deukmejian,* former Attorney General.

*Stephen V. Quesenberry* argued the cause for respondent. With him on the brief were *David J. Rapport* and *Charles Scott.*

*Joshua I. Schwartz* argued the cause for the United States as *amicus curiae* urging affirmance. With him on the brief were *Solicitor General Lee, Assistant Attorney General Dinkins, Robert L. Klarquist,* and *Anne S. Almy.**

---

*Briefs of *amici curiae* urging reversal were filed by *Warren Spannaus,* Attorney General of Minnesota, and *James M. Schoessler,* Special Assistant Attorney General, *David Albert Mustone, Tom D. Tobin, Mark V. Meierhenry,* Attorney General of South Dakota, *Robert L. Timm,* Chief Deputy Attorney General, and *Harold F. X. Purnell* for the State of Minnesota et al.; by *Michael T. Greely,* Attorney General of Montana, and

JUSTICE O'CONNOR delivered the opinion of the Court.

The question presented by this case is whether the State of California may require a federally licensed Indian trader, who operates a general store on an Indian reservation, to obtain a state liquor license in order to sell liquor for off-premises consumption. Because we find that Congress has delegated authority to the States as well as to the Indian tribes to regulate the use and distribution of alcoholic beverages in Indian country,[1] we reverse the judgment of the Court of Appeals for the Ninth Circuit.

## I

The respondent Rehner is a federally licensed Indian trader[2] who operates a general store on the Pala Reservation in San Diego, Cal. The Pala Tribe had adopted a tribal ordinance

---

*Helena S. Maclay* and *Deirdre Boggs*, Special Assistant Attorneys General, for the State of Montana; and by *James M. Goldberg* for the National Alcoholic Beverage Control Association.

Briefs of *amici curiae* urging affirmance were filed by *Art Bunce* for the Agua Caliente Band of Cahuilla Indians; by *George E. Fettinger* and *Kathleen A. Miller* for the Mescalero Apache Tribe; by *Kim Jerome Gottschalk* for the Pala Band of Mission Indians; by *Harry R. Sachse* for the Shoshone Tribe of the Wind River Indian Reservation et al.; and by *Douglas L. Bell, Allen H. Sanders,* and *Jeffrey Schuster* for the Tulalip and Muckleshoot Indian Tribes.

[1] Title 18 U. S. C. § 1151 defines "Indian country" as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same."

[2] There is some confusion among the parties and *amici* as to whether the court below held that the tribes had exclusive jurisdiction over the licensing and distribution of liquor on reservations irrespective of the identity of the vendor. Although we acknowledge that the decision below is somewhat ambiguous in this respect, we construe the opinion as applying only to vendors, like Rehner, who are members of the governing tribe.

permitting the sale of liquor on the reservation providing that the sales conformed to state law, and this ordinance was approved by the Secretary of the Interior. See 25 Fed. Reg. 3343 (1960). Rehner then sought from the State an exemption from its law requiring a state license for retail sale of distilled spirits for off-premises consumption.[3] When she was refused an exemption, Rehner filed suit seeking a declaratory judgment that she did not need a license from the State, and an order directing that liquor wholesalers could sell to her. The District Court granted the State's motion to dismiss, ruling that Rehner was required to have a state license under 18 U. S. C. § 1161, which provides that liquor transactions in Indian country are not subject to prohibition under federal law provided those transactions are "in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country . . . ."[4]

The Court of Appeals reversed the District Court, holding that § 1161 did not confer jurisdiction on the States to require liquor licenses. The court held that "18 U. S. C. § 1161 preempts state licensing and distribution jurisdiction over tribal liquor sales in Indian country." 678 F. 2d 1340, 1351 (1982).[5]

---

[3] The California licensing scheme is found in Cal. Bus. & Prof. Code Ann. § 23000 et seq. (West 1964 and Supp. 1983).

[4] Section 1161 provides in full:

"The provisions of sections 1154, 1156, 3113, 3488, and 3618, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transaction is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register."

[5] Rehner appealed to the Court of Appeals for the Ninth Circuit, and, before a three-judge panel of that court rendered a decision on the appeal, two more cases arose presenting similar issues. The Ninth Circuit then scheduled argument en banc for all three cases. The companion cases were *Muckleshoot Indian Tribe* v. *Washington*, No. 79–4403, and *Tulalip Tribes* v. *Washington*, No. 79–4404 (CA9). These cases involved, *inter*

In deciding the pre-emption issue, the court focused on two aspects of § 1161. First, it held that "there is insufficient evidence to show that Congress intended section 1161 to confer on the states regulatory jurisdiction over on-reservation liquor traffic." *Id.*, at 1343. The court reasoned that the liquor transactions at issue were governed exclusively by federal law, and that if Congress wished to remove "its veil of preemption," it needed to do so by an express statement that the State had jurisdiction to impose its licensing requirement. *Ibid.* Second, the court held that "section 1161 has preemptive effect" because Congress provided for tribal ordinances that were to be certified by the Secretary of the Interior and published in the Federal Register. *Id.*, at 1348–1349, 1349, n. 18. In this way, "the regulatory authority of the tribes . . . was safeguarded by federal supervision." *Id.*, at 1349.[6]

---

*alia,* state sales taxes imposed on reservation liquor transactions, an issue not discussed or relied upon by the court below in this case. The court remanded these two companion cases to the District Court in the light of *Washington* v. *Confederated Tribes of Colville Indian Reservation,* 447 U. S. 134 (1980).

[6] The court also rejected the argument, made by one of the parties in the companion cases, that the Twenty-first Amendment permitted the States to exercise regulatory jurisdiction over liquor transactions on reservations. Because we base our holding on § 1161, we do not reach the issue whether the Twenty-first Amendment permits the State to exercise jurisdiction over liquor transactions on reservations. We also do not consider whether the State effectively has authority to regulate licensing and distribution of liquor transactions on reservations under any other statute. See 28 U. S. C. § 1360 (1976 ed. and Supp. V); 18 U. S. C. § 1162. At oral argument, both Rehner's attorney and counsel for the United States as *amicus curiae* suggested that the State had broad powers to enforce "substantive" state liquor laws on reservations through 18 U. S. C. § 1162. See Tr. of Oral. Arg. 31–32, 40. See n. 18, *infra.*

Finally, we reject Rehner's suggestion that this case has become moot because California now permits wholesalers to sell to unlicensed persons on Indian reservations. See Cal. Bus. & Prof. Code Ann. § 23384 (West Supp. 1983). At oral argument, the State confirmed that despite this statutory change, the licensing requirement is still in effect. Tr. of Oral Arg. 19.

## II

The decisions of this Court concerning the principles to be applied in determining whether state regulation of activities in Indian country is pre-empted have not been static. In *Worcester* v. *Georgia*, 6 Pet. 515, 560 (1832), Chief Justice Marshall wrote that an Indian reservation "is a distinct community, occupying its own territory, with boundaries accurately described, in which [state laws] can have no force . . . ." Despite this early statement emphasizing the importance of tribal self-government, "Congress has to a substantial degree opened the doors of reservations to state laws, in marked contrast to what prevailed in the time of Chief Justice Marshall," *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 74 (1962). "[E]ven on reservations, state laws may be applied unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148 (1973).

Although "[f]ederal treaties and statutes have been consistently construed to reserve the right of self-government to the tribes," F. Cohen, Handbook of Federal Indian Law 273 (1982 ed.) (hereafter Cohen), our recent cases have established a "trend . . . away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 172 (1973) (footnote omitted). The goal of any pre-emption inquiry is "to determine the congressional plan," *Pennsylvania* v. *Nelson*, 350 U. S. 497, 504 (1956), but tribal sovereignty may not be ignored and we do not necessarily apply "those standards of pre-emption that have emerged in other areas of the law." *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 143 (1980). We have instead employed a pre-emption analysis that is informed by historical notions of tribal sovereignty, rather than determined by them. "[C]ongressional authority and the 'semi-independent position' of Indian tribes . . . [are] two

independent but related barriers to the assertion of state regulatory authority over tribal reservations and members." *Bracker*, 448 U. S., at 142. Although "[t]he right of tribal self-government is ultimately dependent on and subject to the broad power of Congress," *id.*, at 143, we still employ the tradition of Indian sovereignty as a "backdrop against which the applicable treaties and federal statutes must be read" in our pre-emption analysis. *McClanahan, supra*, at 172. We do not necessarily require that Congress explicitly pre-empt assertion of state authority insofar as Indians on reservations are concerned, but we have recognized that "any applicable regulatory interest of the State must be given weight" and "'automatic exemptions "as a matter of constitutional law"'" are unusual." *Bracker, supra*, at 144 (quoting *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463, 481, n. 17 (1976)).

The role of tribal sovereignty in pre-emption analysis varies in accordance with the particular "notions of sovereignty that have developed from historical traditions of tribal independence." *Bracker, supra*, at 145. These traditions themselves reflect the "accommodation between the interests of the Tribes and the Federal Government, on the one hand, and those of the State, on the other." *Washington* v. *Confederated Tribes of Colville Indian Reservation*, 447 U. S. 134, 156 (1980). However, it must be remembered that "tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States." *Id.*, at 154. "The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and *is subject to complete defeasance*." *United States* v. *Wheeler*, 435 U. S. 313, 323 (1978) (emphasis added). See also *Confederated Tribes, supra*, at 178–179 (opinion of REHNQUIST, J.).

When we determine that tradition has recognized a sovereign immunity in favor of the Indians in some respect, then we usually are reluctant to infer that Congress has authorized the assertion of state authority in that respect "'except

where Congress has expressly provided that State laws shall apply.'" *McClanahan, supra,* at 171 (quoting U. S. Dept. of the Interior, Federal Indian Law 845 (1958) (hereafter Indian Law)). Repeal by implication of an established tradition of immunity or self-governance is disfavored. *Bryan* v. *Itasca County,* 426 U. S. 373, 392 (1976). If, however, we do not find such a tradition, or if we determine that the balance of state, federal, and tribal interests so requires, our pre-emption analysis may accord less weight to the "backdrop" of tribal sovereignty. See *Confederated Tribes, supra,* at 154–159; *Mescalero Apache Tribe, supra.*

## A

We first determine the nature of the "backdrop" of tribal sovereignty that will inform our pre-emption analysis. The "backdrop" in this case concerns the licensing and distribution of alcoholic beverages, and we must determine whether there is a tradition of tribal sovereign immunity that may be repealed only by an explicit directive from Congress.

We begin by noting that there is nothing in the record to indicate that a federally licensed Indian trader like Rehner may sell liquor for off-premises consumption only to members of the Pala Tribe. Indeed, the State contends, and Rehner does not dispute, that Rehner, or any other federally licensed trader, may sell liquor to Indian and non-Indian buyers alike. See Brief for Petitioner 81; Tr. of Oral Arg. 14. To the extent that Rehner seeks to sell to non-Indians, or to Indians who are not members of the tribe with jurisdiction over the reservation on which the sale occurred, the decisions of this Court have already foreclosed Rehner's argument that the licensing requirements infringe upon tribal sovereignty.[7]

---

[7] In *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463 (1976), we held that a State may impose a nondiscriminatory tax on non-Indian customers of Indian retailers who conducted their businesses on the reservation, and that the State may require that the Indian retailer enforce and collect this tax. We upheld the tax on non-Indians in *Moe* even though we recognized that

If there is any interest in tribal sovereignty implicated by imposition of California's alcoholic beverage regulation, it exists only insofar as the State attempts to regulate Rehner's sale of liquor to other members of the Pala Tribe on the Pala Reservation. The only interest that Rehner advances in this regard is that freedom to regulate alcoholic beverages is important to Indian self-governance. To the extent California limits the absolute number of licenses that it distributes, state regulation may effectively preclude this aspect of self-governance. See Brief for Respondent 63–74. Rehner relies on our statement in *United States* v. *Mazurie*, 419 U. S. 544, 557 (1975), that the distribution and use of intoxicants is a "matte[r] that affect[s] the internal and social relations of tribal life."

Rehner's reliance on *Mazurie* as establishing tribal sovereignty in the area of liquor licensing and distribution is misplaced. In *Mazurie*, we held that "independent tribal authority is quite sufficient to protect Congress' decision to vest in tribal councils this portion of *[Congress'] own authority*" to regulate commerce with the Indians. *Ibid.* (emphasis

_____

in "'the special area of state taxation, absent cession of jurisdiction or other federal statutes permitting it, there has been no satisfactory authority for taxing Indian reservation lands or Indian income from activities carried on within the boundaries of the reservation . . . .'" *Id.*, at 475–476 (quoting *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145, 148 (1973)). In *Confederated Tribes*, we said of the tax upheld in *Moe* that "[s]uch a tax may be valid even if it seriously disadvantages or eliminates the Indian retailer's business with non-Indians. . . . [because] the Tribes have no vested right to a certain volume of sales to non-Indians, or indeed to any such sales at all." 447 U. S., at 151, and n. 27. In *Confederated Tribes*, we also held that Indians resident on the reservation but nonmembers of the governing tribe "stand on the same footing as non-Indians resident on the reservation" insofar as imposition of tax on cigarette sales is concerned. *Id.*, at 161. Regulation of sales to non-Indians or nonmembers of the Pala Tribe simply does not "contravene the principle of tribal self-government," *ibid.*, and, therefore, neither Rehner nor the Pala Tribe has any special interest that militates against state regulation in this case, providing that Congress has not pre-empted such regulation.

added). We expressly declined to base our holding on whether "independent [tribal] authority *is itself* sufficient for the tribes to impose" their own liquor regulations. *Ibid.* (emphasis added).

The reason that we declined is apparent in the light of the history of federal control of liquor in this context, which must be characterized as "one of the most comprehensive [federal] activities in Indian affairs . . . ." Cohen, at 307. Unlike the authority to tax certain transactions on reservations that we have characterized as "a fundamental attribute of sovereignty which the tribes retain unless divested of it by federal law or necessary implication of their dependent status," *Confederated Tribes*, 447 U. S., at 152, tradition simply has not recognized a sovereign immunity or inherent authority in favor of liquor regulation by Indians. The colonists regulated Indian liquor trading before this Nation was formed, and Congress exercised its authority over these transactions as early as 1802. See Indian Law, at 381. Congress imposed complete prohibition by 1832, and these prohibitions are still in effect subject to suspension conditioned on compliance with state law and tribal ordinances.[8]

---

[8] As Cohen notes: "Restriction on traffic in liquor with the Indians began in early colonial times. The tribes themselves at various times have sought to control liquor use, and it is worthy of note that the first federal control measure was enacted, at least in part, in response to the verbal plea of an Indian chief to President Jefferson in 1802. That measure was not a criminal law and depended on civil regulation of trafficking. The first prohibitions were enacted in 1822 and 1832, monetary penalties were added in the Trade and Intercourse Act of 1834, and imprisonment was added in 1862.

"Since 1834 federal law has specifically penalized both the introduction of liquor into Indian country and the operation of a distillery therein. Possession of liquor in Indian country has been a separate crime since 1918. . . .

"The 1834 Act also prohibited selling (or otherwise conveying) liquor to an Indian in Indian country; the 1862 replacement of this statute broadened the sale prohibition to include all Indians under the superintendence of a

Although in Indian matters Congress usually acts "upon the assumption that the States have no power to regulate the affairs of Indians on a reservation," *Williams* v. *Lee*, 358 U. S. 217, 220 (1959), that assumption would be unwarranted in the narrow context of the regulation of liquor. In addition to the congressional divestment of tribal self-government in this area, the States have also been permitted, and even required, to impose regulations related to liquor transactions. As a condition of entry into the United States, Arizona, New Mexico, and Oklahoma were required by Congress to enact prohibitions against the sale of liquor to Indians and introduction of liquor into Indian country.[9] Several States, including California, pursuant to state police power, long prohibited liquor transactions with Indians.[10] These state prohibitions indicate that "'absolute' federal jurisdiction is not invariably exclusive jurisdiction." *Kake Village*, 369 U. S., at 68. Indeed, we have recognized expressly that "[t]he federal prohibition against taking intoxicants into this Indian colony does not deprive the State of Nevada of its sovereignty over the area in question. The Federal Government does not assert

---

federal agent, even outside Indian country. This provision is still in the code as part of 18 U. S. C. § 1854, but is confined to Indian country by 18 U. S. C. § 1161 and can be conditionally suspended by enactment of a tribal ordinance pursuant to the latter section." Cohen, at 306–307 (footnotes omitted).

[9] See Ariz. Const., Art. 20, ¶ 3 (prohibition removed in 1954); N. M. Const., Art. XXI, § 1 (1911) (prohibition removed in 1953); Okla. Const., Art. I, § 7 (1907) (prohibition removed in 1959).

[10] See, *e. g.*, *State* v. *Rorvick*, 76 Idaho 58, 277 P. 2d 566 (1954); *State* v. *Lindsey*, 133 Wash. 140, 233 P. 327 (1925); *Dagan* v. *State*, 162 Wis. 353, 156 N. W. 153 (1916); *State* v. *Justice*, 44 Utah 484, 141 P. 109 (1914); *State* v. *Mamlock*, 58 Wash. 631, 109 P. 47 (1910); *People* v. *Gebhard*, 151 Mich. 192, 115 N. W. 54 (1908); *Tate* v. *State*, 58 Neb. 296, 78 N. W. 494 (1899); *State* v. *Wise*, 70 Minn. 99, 72 N. W. 843 (1897); *People* v. *Bray*, 105 Cal. 344, 38 P. 731 (1894); *Territory* v. *Guyott*, 9 Mont. 46, 22 P. 134 (1889); *Territory* v. *Coleman*, 1 Ore. 191 (1855). See also G. Colby, Digest of the Excise Laws of Some of the States of the Union and Foreign Countries 9, 36, 43 (1888) (describing similar laws in Colorado, Missouri, and Nevada).

exclusive jurisdiction within the colony. Enactments of the Federal Government passed to protect and guard its Indian wards only affect the operation, within the colony, of such state laws *as conflict with the federal enactments*." *United States* v. *McGowan*, 302 U. S. 535, 539 (1938) (footnote omitted; emphasis added).

This historical tradition of concurrent state and federal jurisdiction over the use and distribution of alcoholic beverages in Indian country is justified by the relevant state interests involved. See *Confederated Tribes, supra*, at 156. Rehner's distribution of liquor has a significant impact beyond the limits of the Pala Reservation. The State has an unquestionable interest in the liquor traffic that occurs within its borders, and this interest is independent of the authority conferred on the States by the Twenty-first Amendment. *Crowley* v. *Christensen*, 137 U. S. 86, 91 (1890). Liquor sold by Rehner to other Pala tribal members or to nonmembers can easily find its way out of the reservation and into the hands of those whom, for whatever reason, the State does not wish to possess alcoholic beverages, or to possess them through a distribution network over which the State has no control. This particular "spillover" effect is qualitatively different from any "spillover" effects of income taxes or taxes on cigarettes. "A State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention." *New Mexico* v. *Mescalero Apache Tribe*, 462 U. S. 324, 336 (1983).

There can be no doubt that Congress has divested the Indians of any inherent power to regulate in this area. In the area of liquor regulation, we find no "congressional enactments demonstrating a firm federal policy of promoting tribal self-sufficiency and economic development." *Bracker*, 448 U. S., at 143 (footnote omitted). With respect to the regulation of liquor transactions, as opposed to the state income taxation involved in *McClanahan*, Indians cannot be said to "possess the usual accoutrements of tribal self-government." *McClanahan*, 411 U. S., at 167–168.

The court below erred in thinking that there was some *single* notion of tribal sovereignty that served to direct *any* pre-emption analysis involving Indians. See 678 F. 2d, at 1348.[11] Because we find that there is no tradition of sovereign immunity that favors the Indians in this respect, and because we must consider that the activity in which Rehner seeks to engage potentially has a substantial impact beyond the reservation, we may accord little if any weight to any asserted interest in tribal sovereignty in this case.

## B

We must next determine whether the state authority to license the sale of liquor is pre-empted by federal law. *Bracker, supra,* at 142; *McClanahan, supra,* at 172. The court below held that § 1161 pre-empted state regulation of licensing and distribution, and that the reference to state law in § 1161 was not sufficiently explicit to permit application of the state licensing law.

---

[11] The court stated that it did not reach the sovereignty issue in the light of its holding that § 1161 had pre-emptive effect. See 678 F. 2d, at 1348, and 1349, n. 18. However, the court did acknowledge that it was obligated "to incorporate the principle of tribal sovereignty into our preemption analysis." *Id.*, at 1348.

In dissent, JUSTICE BLACKMUN argues that the Court's analysis of tribal sovereignty has "*never* turned on whether the particular area being regulated is one traditionally within the tribe's control." *Post*, at 739 (emphasis in original). As support for this proposition, JUSTICE BLACKMUN relies on *Ramah Navajo School Board, Inc.* v. *Bureau of Revenue of New Mexico*, 458 U. S. 832 (1982), *Moe* v. *Salish & Kootenai Tribes*, 425 U. S. 463 (1976), and *Mescalero Apache Tribe* v. *Jones*, 411 U. S. 145 (1973). These cases fail to support JUSTICE BLACKMUN's position. In *Ramah*, we held that federal law pre-empted state regulation. In *Moe*, we found that the state regulation was a taxing measure prohibited by federal statute. In *Mescalero Apache Tribe*, we held that the State could not impose a tax on personalty because it was "'permanently attached to the realty'. . . . [and] would certainly be immune from the State's ad valorem property tax." 411 U. S., at 158. Contrary to JUSTICE BLACKMUN's suggestion, none of these cases involved a situation where the Court recognized tribal immunity in a historical context in which the Indians were divested of the inherent power to regulate.

We disagree with both aspects of the court's analysis. As we explained in Part II–A above, the tribes have long ago been divested of any inherent self-government over liquor regulation by both the explicit command of Congress and as a "necessary implication of their dependent status." *Confederated Tribes*, 447 U. S., at 152. Congress has also historically permitted concurrent state regulation through the imposition of criminal penalties on those who supply Indians with liquor, or who introduce liquor into Indian country. Therefore, this is not a case in which we apply a presumption of a lack of state authority.

The presumption of pre-emption derives from the rule against construing legislation to repeal by implication some aspect of tribal self-government. See *Bryan* v. *Itasca County*, 426 U. S., at 391–392; *Morton* v. *Mancari*, 417 U. S. 535, 549–551 (1974). Because there is no aspect of exclusive tribal self-government that requires the deference reflected in our requirement that Congress expressly provide for the application of state law, we have only to determine whether application of the state licensing laws would "impair a right granted or reserved by federal law." *Mescalero Apache Tribe*, 411 U. S., at 148; *Kake Village*, 369 U. S., at 75. Our examination of § 1161 leads us to conclude that Congress authorized, rather than pre-empted, state regulation over Indian liquor transactions.

The legislative history of § 1161 indicates both that Congress intended to remove federal prohibition on the sale and use of alcohol imposed on Indians in 1832, and that Congress intended that state laws would apply of their own force to govern tribal liquor transactions as long as the tribe itself approved these transactions by enacting an ordinance. It is clear that by 1953, federal law curtailing liquor traffic with the Indians came to be "viewed as discriminatory." Indian Law, at 382. As originally introduced, the bill that was later to become § 1161 was intended only to "[t]o terminate Federal discriminations against the Indians of Arizona." See Hearings on H. R. 1055 before the Subcommittee on Indian

Affairs of the House Committee on Interior and Insular Affairs, 83d Cong., 1st Sess. (Jan. 6, 1953) (Hearings), reprinted in App. to Brief for Petitioner A–4.[12]   In hearings on this original bill, Representative Rhodes of Arizona, speaking on behalf of Representative Patten, who introduced the bill, stated that the sole purpose of the bill was to eliminate federal prohibition because it was discriminatory and had a detrimental effect on the Indians.   He also commented that the bill would permit Arizona to amend its Constitution to remove the state prohibitions on sale of liquor to Indians and on introduction of liquor into Indian country.   At these same hearings, Dillon S. Myer, Commissioner of the Bureau of Indian Affairs of the Department of the Interior, submitted a revision of the bill proposed by Representative Patten.   This revision was different from the original bill in a number of respects, the most important of which for present purposes is that the revision applied to *all* States, and not just to Arizona.   In the context of discussing the bill, Commissioner Myer stated: "We certainly do not intend to try to revise State laws regarding Indians or anyone else, and it should be clear that is provided. . . . [The revision] is intended to eliminate all of the sections in the statutes which discriminate against Indians and at the same time not interfere with State laws, and at the same time provide opportunity for the tribes to have prohibition on the reservation if they wish to, if it is not covered by State law."   *Id.*, at A–26—A–27.

In a later hearing, the Department of the Interior submitted an unofficial report in which it was again urged that federal Indian liquor prohibition be ended *generally*, and not just in Arizona, as long as liquor "transactions are in conformity with the ordinances of the tribes concerned and are not contrary to state law."   See Hearings (May 6, 1953), reprinted in App. to Brief for Petitioner A–54.   Representative D'Ewart read into the record a telegram sent by the

---

[12] This hearing, as well as those hearings on May 6, 1953, and June 2, 1953, is not officially published, and all the hearings are reprinted in the petitioner's brief.

Chairman of the Navajo Tribal Council. The telegram indicated that the Navajo people supported the "anti-discrimination bill" as a measure to ensure "equal rights." *Id.*, at A–59.

Representative Patten, the sponsor of the original bill, stated that "if this bill were passed to remove all discrimination, the Indians would still have to comply with State law in every regard . . . ." See Hearings (June 2, 1953), reprinted in App. to Brief for Petitioner A–69. Representative Patten's remarks are particularly valuable in determining the meaning of § 1161. As the sponsor of the bill, Representative Patten's interpretation is an "'authoritative guide to the statute's construction.'" *Bowsher* v. *Merck & Co.*, 460 U. S. 824, 832 (1983) (quoting *North Haven Board of Education* v. *Bell*, 456 U. S. 512, 527 (1982).

The House Report explained the bill as eliminating discrimination caused by legislation "applicable only to Indians." H. R. Rep. No. 775, 83d Cong., 1st Sess., 2 (1953). It included an official report of the Department of the Interior stating that federal prohibition would be lifted only if liquor "transactions are in conformity with the ordinances of the tribes concerned and are not contrary to State law." *Id.*, at 3. The Senate Report also expressed these sentiments: "if this bill is enacted, a State or local municipality or Indian tribes, if they desire, by the enactment of proper legislation or ordinance, *to restrict the sales of intoxicants* to Indians, they may do so." S. Rep. No. 722, 83d Cong., 1st Sess., 1 (1953) (emphasis added).

It is clear then that Congress viewed § 1161 as abolishing federal prohibition, and as legalizing Indian liquor transactions as long as those transactions conformed both with tribal ordinances and state law. It is also clear that Congress contemplated that its absolute but not exclusive power to regulate Indian liquor transactions would be delegated to the tribes themselves, and to the States, which historically shared

concurrent jurisdiction with the Federal Government in this area. Early administrative practice and our prior decision in *United States* v. *Mazurie*, 419 U. S. 544 (1975), confirm this understanding of § 1161.

As noted above, the Bureau of Indian Affairs of the Department of the Interior was heavily involved in drafting the revised bill that eventually became § 1161. In a 1954 administrative opinion, ironically rendered in response to California's interpretation of § 1161, the Department's Solicitor stated plainly that the Bureau contemplated that liquor transactions on reservations would be subject to state laws, including state licensing laws. Specifically, the Solicitor stated:

> "The fact that a tribe in California may by ordinance authorize the sale of liquor on its reservation in packages for consumption only off the premises where it is sold would not, in my opinion, impinge upon the foregoing authority of the State Board of Equalization to license sales of liquor on such reservation for consumption both on and off the premises where the liquor is sold. In such circumstances, if any person so licensed by the State were to sell liquor on the reservation for on-premises consumption in accordance with his license, presumably *he would be immune from State prosecution and, thus, the license issued by the State agency would be fully effective insofar as State law is concerned.*" Memo. Sol. M–36241 (Sept. 22, 1954), *Liquor—Tribal Ordinance Regulating Traffic Within Reservation*, 2 Op. Solicitor of Dept. of Interior Relating to Indian Affairs 1917–1974, pp. 1648, 1650 (emphasis added).

In the Department of the Interior's Indian Law, at 382–383, the Solicitor, citing the 1954 opinion, stated that "if a tribal ordinance permits only package sales on a reservation for consumption off the premises, a State license to sell for consumption on the premises will give protection *only against*

*State prosecutions*, but not against Federal prosecutions under section 1156." (Footnote omitted; emphasis added.)[13]

Both Rehner and the court below believed that § 1161 was merely an exemption from *federal* criminal liability, and affirmatively empowered neither Indian tribes nor the State to regulate liquor transactions. See 678 F. 2d, at 1345; Brief for Respondent 9. Our decision in *Mazurie, supra*, at 554, rejected this argument with respect to Indian tribes, and there is no reason to accept it with respect to the State. In *Mazurie* we held that in enacting § 1161 Congress intended to *delegate* to the tribes a portion of its authority over liquor transactions on reservations. Since we found this delegation on the basis of the statutory language requiring that liquor transactions conform "*both* with the laws of the State . . . and with an ordinance duly adopted" by the governing tribe (emphasis added), we would ignore the plain language of the stat-

---

[13] Although administrative interpretation changed in 1971, see *Applicability of the Liquor Laws of the State of Montana on the Rocky Boy's Reservation*, 78 I. D. 39 (1971), it is clear that the early interpretation by the Bureau of Indian Affairs favors the State's position. As that early position is consistent with the view of Commisioner Myer, whose Bureau revised H. R. 1055, it is surely more indicative of congressional intent in 1953 than a 1971 opinion to the contrary.

In addition, we note that the 1971 opinion of the Solicitor appears to be based on his view that in *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685 (1965), we drew a distinction between state licensing requirements and state "substantive" liquor laws, and found only the latter to be applicable under § 1161. See 78 I. D., at 40, n. 1. In *Warren Trading Post Co.*, we actually described § 1161 as "permitting application of state liquor law standards within an Indian reservation under certain conditions." 380 U. S., at 687, n. 3. We fail to understand how our description of § 1161 in that opinion can be interpreted as creating a distinction between "substantive" and "regulatory" laws. To the extent that the Solicitor's new interpretation owes anything to our decision in *Warren Trading Post Co.*, we reject the interpretation.

In dissent, JUSTICE BLACKMUN accepts the distinction between substantive and licensing laws that he believes was articulated in *Warren Trading Post Co.* For the reasons explained in this note and n. 18, *infra*, JUSTICE BLACKMUN's arguments are not successful.

ute if we failed to find this same delegation in favor of the States.[14]   Rehner argues that *Mazurie* merely acknowledged that Indian tribes "possessed independent authority" over liquor transactions.   Brief for Respondent 67.   As we noted in the context of our discussion of the doctrine of tribal sovereignty, we expressly declined to base our holding in *Mazurie* on the doctrine of tribal self-government; rather, we held merely that the tribal authority was sufficient to protect the congressional decision to delegate licensing authority.   See 419 U. S., at 557.   It cannot be doubted that the State's police power over liquor transactions within its borders is broad enough to protect the same congressional decision in favor of the State.

The thrust of Rehner's argument, and the primary focus of the court below, is that state authority in this area is preempted because such authority requires an express statement by Congress in the light of the canon of construction that we quoted in *McClanahan:* "'State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply.'"   411 U. S., at 170–171 (quoting Indian Law, at 845).   As we have established above, because of the lack of a tradition of self-government in the area of liquor regulation, it is not necessary that Congress indicate expressly that the State has jurisdiction to regulate the licensing and distribution of alcohol.[15]

---

[14] Indeed, given the history of concurrent state jurisdiction and the tradition of complete prohibition imposed on the Indians, the delegation to the States is more readily apparent than the delegation to the tribes.

[15] This canon is based, in part, on the notion that we normally resolve any doubt in a pre-emption analysis in favor of the Indians because of their status as "'wards of the nation.'"   *McClanahan* v. *Arizona State Tax Comm'n*, 411 U. S. 164, 174 (1973) (quoting *Carpenter* v. *Shaw*, 280 U. S. 363, 367 (1930)).   Even if this canon properly informed a pre-emption analysis that involved a historic tradition of federal and state regulation, its application in the context of liquor licensing and distribution would be problematic.   Liquor trade has been regulated among the Indians largely

Even if this canon of construction were applicable to this case, our result would be the same. The canon is quoted from Indian Law, at 845. In that same volume, the Solicitor of the Interior Department assumed that § 1161 would result in state prosecutions for failing to have a state license. See *id.*, at 382–383. Whatever Congress had to do to provide "expressly" for the application of state law, the Solicitor obviously believed that Congress had done it in § 1161. Indeed, even in *McClanahan*, we suggested that § 1161 satisfied the canon of construction requiring that Congress expressly provide for application of state law. In discussing statutes that did satisfy the canon, we cited § 1161 and stated that "state liquor laws may be applicable within reservations." 411 U. S., at 177, n. 16.[16] More important, we have consistently refused to apply such a canon of construction when application would be tantamount to a formalistic disregard of congressional intent. "We give this rule [resolving ambiguities

---

due to early attempts by the tribes themselves to seek assistance in controlling Indian access to liquor. See talk delivered by Little Turtle to President Thomas Jefferson on January 4, 1802, reprinted in 4 American State Papers, Indian Affairs, Vol. 1, p. 655 (1832). In many respects, the concerns about liquor expressed by the tribes were responsible for the development of the dependent status of the tribes. When the substance to be regulated is that primarily responsible for "dependent" status, it makes no sense to say that the historical position of Indians as federal "wards" militates in favor of giving exclusive control over licensing and distribution to the tribes.

[16] In three other cases, we have assumed that § 1161 delegated the authority that we now find that it so delegated. In *Organized Village of Kake* v. *Egan*, 369 U. S. 60, 74 (1962), we stated that "the sale of liquor on reservations has been permitted subject to state law, on consent of the tribe itself." In *United States* v. *Mazurie*, 419 U. S. 544, 547 (1975), we stated that § 1161 permitted "Indian tribes, with the approval of the Secretary of the Interior, to regulate the introduction of liquor into Indian country, so long as state law was not violated." Finally, in *Warren Trading Post Co.*, 380 U. S., at 687, n. 3, we described § 1161 as "permitting application of state liquor law standards within an Indian reservation under certain conditions."

in favor of Indians] the broadest possible scope, but it remains at base a canon for construing the complex treaties, statutes, and contracts which define the status of Indian tribes. A canon of construction is not a license to disregard clear expressions of tribal and congressional intent." *DeCoteau* v. *District County Court*, 420 U. S. 425, 447 (1975). See also *Andrus* v. *Glover Construction Co.*, 446 U. S. 608, 619 (1980). In the present case, congressional intent is clear from the face of the statute and its legislative history.[17]

We conclude that § 1161 was intended to remove federal discrimination that resulted from the imposition of liquor prohibition on Native Americans. Congress was well aware that the Indians never enjoyed a tradition of tribal self-government insofar as liquor transactions were concerned. Congress was also aware that the States exercised concurrent authority insofar as prohibiting liquor transactions with Indians was concerned. By enacting § 1161, Congress intended to delegate a portion of its authority to the tribes as well as to the States, so as to fill the void that would be created by the absence of the discriminatory federal prohibition.

---

[17] The court below held that "[t]he Termination Acts, Pub. L. 280 [28 U. S. C. § 1360(a)] and section 1161 are statutes regarding the applicability of state law in Indian country and must therefore be considered *in pari materia* and construed together." 678 F. 2d, at 1345, n. 9. In the court's view, § 1161 did not contain language regarding state authority expressed as clearly as in the other statutes. We reject this argument in the light of the clear congressional intent in this case.

Rehner also argues that in the context of passing Pub. L. 280, Congress rejected the view that repeal of federal prohibition was contingent upon applicability of state liquor law. See Brief for Respondent 41–44. Rehner neglects to note that what Congress originally contemplated was that federal prohibition would be lifted in return for Indian acquiescence to broad state civil and criminal jurisdiction over reservations. See Hearings on H. R. 459, H. R. 3235, and H. R. 3624 before the Subcommittee on Indian Affairs of the House Committee on Interior and Insular Affairs, 82d Cong., 2d Sess., 30, 48 (1952).

Congress did not intend to make tribal members "super citizens" who could trade in a traditionally regulated substance free from all but self-imposed regulations. See 678 F. 2d, at 1352 (Goodwin, J., dissenting). Rather, we believe that in enacting § 1161, Congress intended to recognize that Native Americans are not "weak and defenseless," and are capable of making personal decisions about alcohol consumption without special assistance from the Federal Government. Application of the state licensing scheme does not "impair a right granted or reserved by federal law." *Kake Village*, 369 U. S., at 75.[18] On the contrary, such application of state law

---

[18] The Court of Appeals appeared to accept the argument that Congress delegated to the tribes the exclusive right to license liquor distribution. According to this argument, the reference to state law in § 1161 refers only to the fact that for purposes of determining whether a violation of federal law has occurred, state substantive law, and not regulatory law, is to be incorporated by reference into the federal scheme. The difficulty with this argument is apparent. Nowhere in the text of § 1161, or in the legislative history, is there any distinction between "substantive" and "regulatory" laws. The distinction cannot be found in our decision in *Warren Trading Post Co., supra.* See n. 13, *supra.* In the absence of a context that might possibly require it, we are reluctant to make such a distinction. Cf. *Bryan* v. *Itasca County*, 426 U. S. 373, 390 (1976) (grant of civil jurisdiction in 28 U. S. C. § 1360 does not include regulatory jurisdiction to tax in light of tradition of immunity from taxation). We also note that it appears as though the court was interpreting the reach of *federal criminal jurisdiction* under § 1161 as much as it was deciding the scope of state jurisdiction. In the light of the fact that the Federal Government was not a party below, we do not understand this aspect of the court's holding.

The court also held that because tribal ordinances must be approved by the Secretary of the Interior, Congress has shown its intention to occupy the field. We reject this argument on the basis of the plain language of the statute and its legislative history. That Rehner is a licensed federal trader is also insufficient to show that Congress intended to occupy the field to the exclusion of state laws. Rehner relies on our decision in *Warren Trading Post Co., supra,* in which we held that Arizona could not impose a tax on a federally licensed trader for income earned through trading with reservation Indians on the reservation. In *Warren Trading Post Co.*, we held that Congress did not authorize any additional burden on the licensed trader while in this case we think that Congress *did* authorize the

is "specifically authorized by . . . Congress . . . and [does] not interfere with federal policies concerning the reservations." *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S. 685, 687, n. 3 (1965).

## III

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN and JUSTICE MARSHALL join, dissenting.

The Court today holds that a State may prevent a federally licensed Indian trader from selling liquor on an Indian reservation, or may condition the trader's right to sell liquor upon payment of a substantial license fee. Because I believe the State lacks authority to require a license, I dissent.

Since 1790, see Act of July 22, 1790, ch. 33, 1 Stat. 137, the Federal Government has regulated trade with the Indians and has required persons engaging in such trade to obtain a federal license. Existing law provides:

> "The Commissioner of Indian Affairs shall have the *sole* power and authority to appoint traders to the Indian tribes and to make such rules and regulations as he may deem just and proper specifying the kind and quantity of goods and the prices at which such goods shall be sold to the Indians." Act of Aug. 15, 1876, ch. 289, § 5, 19 Stat. 200, 25 U. S. C. § 261 (emphasis added).

A person wishing to trade with the Indians is "permitted to do so under such rules and regulations as the Commissioner

---

regulation. In addition, we recognized in *Warren Trading Post Co.* itself the difference between § 1161 and the income tax. See n. 13, *supra.* Our decision in *Central Machinery Co.* v. *Arizona State Tax Comm'n*, 448 U. S. 160 (1980), upon which Rehner also relies in this respect, is based on *Warren Trading Post Co.*, and similarly fails to support Rehner's point.

of Indian Affairs may prescribe," once he has established "to the satisfaction of the Commissioner . . . that he is a proper person to engage in such trade." Act of Mar. 3, 1901, ch. 832, § 1, 31 Stat. 1066, as amended by the Act of Mar. 3, 1903, ch. 994, § 10, 32 Stat. 1009, 25 U. S. C. § 262.

Pursuant to this statutory authority, the Commissioner of Indian Affairs has promulgated detailed regulations governing the licensing and conduct of Indian traders. 25 CFR §§ 140.1–140.26 (1983). An applicant for an Indian trader's license must submit information regarding his financing, his background and business experience, and the persons he intends to employ. Both the applicant and his employees must provide detailed references. See § 140.9(a). Gambling and drug sales on licensed premises are prohibited. §§ 140.19, 140.21. The trader's prices are reviewable by federal officials, his books are subject to inspection, his merchandise must be of good quality, and his credit practices are restricted. §§ 140.22, 140.24. These statutes and regulations governing trade with the Indians have been described aptly as "comprehensive" and "all-inclusive." *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685, 690 (1965).

In *Warren Trading Post,* the Court stated that these statutes and regulations "would seem in themselves sufficient to show that Congress has taken the business of Indian trading on reservations so fully in hand that no room remains for state laws imposing additional burdens upon traders." The Court held that a State could not levy a gross proceeds tax upon the income of a licensed Indian trader, reasoning that imposition of the tax

> "would to a substantial extent frustrate the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders . . . except as authorized by Acts of Congress or by valid regulations promulgated under those Acts. This state tax on gross income would put financial burdens on [the trader] or the Indians with whom it deals in addition to those Congress or the tribes

have prescribed, and could thereby disturb and disarrange the statutory plan Congress set up . . . ." *Id.*, at 691.

The Court recently reaffirmed *Warren Trading Post* in *Central Machinery Co.* v. *Arizona Tax Comm'n,* 448 U. S. 160 (1980). In that case, the Court held that federal regulation of Indian traders was so comprehensive that States lacked authority to tax even a sale by an unlicensed trader who maintained no place of business on the reservation. "It is the existence of the Indian trader statutes," the Court said, "and not their administration, that pre-empts the field of transactions with Indians occurring on reservations." *Id.*, at 165. The Court noted that Congress had "'undertaken to regulate reservation trading in such a comprehensive way that there is no room for the States to legislate on the subject.'" *Id.*, at 166, quoting *Warren Trading Post,* 380 U. S., at 691, n. 18.

The Court's reasoning in *Warren Trading Post* and *Central Machinery,* both of which involved state taxes, necessarily extends to other types of state regulation as well. A State, through its own licensing requirement, cannot choose who may trade with the Indians and what goods they may sell. The "sole power and authority" to make decisions of this type is vested in the Commissioner of Indian Affairs, 25 U. S. C. § 261, and applicants who win the Commissioner's approval are to be permitted to trade, § 262. An independent requirement of approval by state authorities has no place in this scheme. Yet California imposes just such a requirement on Indian traders who choose to sell a particular product—liquor. California reserves to itself the power to deny any trader the right to sell, and from those to whom it grants permission, it requires a substantial fee.[1] As in *Warren Trad-*

---

[1] An application for an off-sale general liquor license must be accompanied by a fee of $6,000, which is deposited in the State's General Fund. Cal. Bus. & Prof. Code Ann. § 23954.5 (West Supp. 1983). Once a license is granted, the licensee must pay annual fees totalling $409. §§ 23053.5,

*ing Post*, this licensing requirement clearly "frustrate[s] the evident congressional purpose of ensuring that no burden shall be imposed upon Indian traders . . . except as authorized by Acts of Congress or by valid regulations." 380 U. S., at 691.

The Court does not explain how it reconciles California's liquor licensing requirement with federal law governing Indian traders. Instead, the Court appears to rest its conclusion on three propositions. First, the Court asserts that "tradition simply has not recognized a sovereign immunity or inherent authority in favor of liquor regulation by Indians." *Ante*, at 722; see *ante*, at 725, 731. Second, the Court finds a "historical tradition of concurrent state and federal jurisdiction over the use and distribution of alcoholic beverages in Indian country." *Ante*, at 724; see *ante*, at 726, 728, 731, n. 14. Third, the Court concludes that Congress "authorized . . . state regulation over Indian liquor transactions" by enacting 18 U. S. C. § 1161. *Ante*, at 726. None of these propositions supports the Court's conclusion.

The Court gives far too much weight to the fact that Indian tribes historically have not exercised regulatory authority over sales of liquor. In prior pre-emption cases, the Court's focus properly and consistently has been on the reach and comprehensiveness of applicable federal law, colored by the recognition that "traditional notions of Indian self-government are so deeply engrained in our jurisprudence that they have provided an important 'backdrop' . . . against which vague or ambiguous federal enactments must always be measured." *White Mountain Apache Tribe* v. *Bracker*, 448 U. S. 136, 143 (1980), quoting *McClanahan* v. *Arizona State*

---

23320(21), 23320.2. Portions of these fees are deposited in the General Fund as well. See §§ 23320.2, 25761. Licenses are available in very limited numbers, see § 23817 (West 1964), but are transferable upon the approval of the Department of Alcoholic Beverage Control, see § 24070 (West Supp. 1983). Respondent Rehner has alleged that the market price for an off-sale general license is approximately $55,000. App. JA–7.

*Tax Comm'n,* 411 U. S. 164, 172 (1973). The Court's analysis has *never* turned on whether the particular area being regulated is one traditionally within the tribe's control. In *Ramah Navajo School Board, Inc.* v. *Bureau of Revenue,* 458 U. S. 832 (1982), for example, the Court held that comprehensive and pervasive federal regulation of Indian schools precluded the imposition of a state tax on construction of such a school. The Court did not find it relevant that federal policy had not "encourag[ed] the development of Indian-controlled institutions" until the early 1970's, *id.,* at 840, or that the school in question was "the first independent Indian school in modern times," *id.,* at 834. In *Moe* v. *Salish & Kootenai Tribes,* 425 U. S. 463 (1976), the Court held that a State could not require the operator of an on-reservation "smoke shop" to obtain a state cigarette retailer's license; the Court did not inquire whether tribal Indians traditionally had exercised regulatory authority over cigarette sales. And in *Mescalero Apache Tribe* v. *Jones,* 411 U. S. 145 (1973), the Court concluded that a State could not impose a use tax on personalty installed in ski lifts at a tribal resort, yet it could scarcely be argued that the construction of ski resorts is a matter with which Indian tribes historically have been concerned.

It is hardly surprising, given the once-prevalent view of Indians as a dependent people in need of constant federal protection and supervision, that tribal authority until recent times has not extended to areas such as education, cigarette retailing, and development of resorts. State authority has been pre-empted in these areas not because they fall within the tribes' historic powers, but rather because federal policy favors leaving Indians free from state control, and because federal law is sufficiently comprehensive to bar the States' exercise of authority. And "[c]ontrol of liquor has historically been one of the most comprehensive federal activities in Indian affairs." F. Cohen, Handbook of Federal Indian Law 307 (1982 ed.). Federal regulation began in 1802, Act of

Mar. 30, 1802, § 21, 2 Stat. 146, and sales of liquor to Indians or in Indian country were absolutely prohibited by federal law until 1953. See 18 U. S. C. §§ 1154, 1156.

In light of this absolute prohibition, the Court's reliance in this case upon what it perceives as a "historical tradition of concurrent state and federal jurisdiction over the use and distribution of alcoholic beverages in Indian country," *ante,* at 724, is disingenuous at best. The Court correctly notes that States were permitted, and in some instances required, to enforce these federal prohibitions through their own criminal laws. *Ante,* at 723–724, and nn. 9, 10. But the sources cited by the Court do not even suggest that the States had independent authority to decide who might sell liquor in Indian country, or to impose regulations in addition to those found in federal law.[2]

The only possible source of state authority to regulate liquor sales, and the source upon which the Court ultimately relies, is 18 U. S. C. § 1161. This statute provides that various federal criminal prohibitions against the sale of liquor in Indian country shall not apply to sales "in conformity both with the laws of the State . . . and with an ordinance duly adopted by the tribe having jurisdiction over [the] area . . . ."[3] Sec-

---

[2] For the most part, the cases cited by the Court upheld convictions under state statutes barring liquor sales on or off the reservation to persons of Indian descent. Such statutes clearly would be unconstitutional today, and in any event involved no exercise of state regulatory authority over reservation activities. The one case involving on-reservation activity is *State* v. *Lindsey,* 133 Wash. 140, 233 P. 327 (1925), which upheld a conviction of a non-Indian operating a distillery on reservation land. The court concluded that state law was applicable because "no personal or property right of an Indian, tribal or non-tribal, [was] involved in the action," *id.,* at 144, 233 P., at 328, relying on this Court's decision in *Draper* v. *United States,* 164 U. S. 240 (1896).

[3] Section 1161 provides in full:

"The provisions of sections 1154, 1156, 3113, 3488, and 3618, of this title, shall not apply within any area that is not Indian country, nor to any act or transaction within any area of Indian country provided such act or transac-

tion 1161 operates as "local-option legislation allowing Indian tribes, with the approval of the Secretary of the Interior, to regulate the introduction of liquor into Indian country, so long as state law [is] not violated." *United States* v. *Mazurie*, 419 U. S. 544, 547 (1975). As is demonstrated by the Court's review of the legislative history, *ante*, at 726–728, and indeed by the language of the statute itself, § 1161 ensures that sales of liquor that would be contrary to state law remain prohibited by federal statute. If a State is altogether "dry," Indian country within that State must be "dry" as well. If a State bans liquor sales to minors or liquor sales on Sundays, sales to minors and Sunday sales also are forbidden in the Indian country. Section 1161, in other words, as the Court has said in the past, "permit[s] application of state liquor law *standards* within an Indian reservation." *Warren Trading Post Co.* v. *Arizona Tax Comm'n*, 380 U. S., at 687, n. 3 (emphasis added).[4]

In this case, of course, no question is raised respecting compliance with state liquor law standards. Respondent Rehner has not challenged the substantive conditions imposed by the State upon the sale of liquor. The sole question before the Court is whether § 1161 grants the State regulatory jurisdiction over liquor transactions on Indian

---

tion is in conformity both with the laws of the State in which such act or transaction occurs and with an ordinance duly adopted by the tribe having jurisdiction over such area of Indian country, certified by the Secretary of the Interior, and published in the Federal Register."

The sections cross-referenced in § 1161 prohibit the distribution of alcoholic beverages to Indians and the possession of alcoholic beverages in Indian country, and establish procedures for enforcing these prohibitions.

[4] Since California exercises general criminal jurisdiction over Indian country pursuant to § 2 of Pub. L. 280, 67 Stat. 588, as amended, 18 U. S. C. § 1162, it may enforce directly any substantive criminal provisions governing liquor sales on Indian reservations. For example, it is a misdemeanor under California law to sell or furnish liquor to a minor, Cal. Bus. & Prof. Code Ann. § 25658 (West 1964); this provision is as applicable in Indian country as elsewhere.

reservations, or, in other words, whether it authorizes the State to require a license as a condition of doing business.[5] On this question, the statute and its legislative history are silent.

This silence is significant, in light of the Court's frequent recognition that "'State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply.'" *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S., at 170–171, quoting U. S. Dept. of the Interior, Federal Indian Law 845 (1958); *Bryan* v. *Itasca County,* 426 U. S. 373, 376, n. 2 (1976). In cases where a State seeks to assert regulatory authority, the Court has required far more than a mere reference to state law in a federal statute. In *Bryan* v. *Itasca County,* for example, the Court refused to find a grant of regulatory authority in § 4(a) of Pub. L. 280, 67 Stat. 589, as amended, 28 U. S. C. § 1360(a), which provides that a State's "civil laws . . . that are of general application to private persons or private property shall have the same force and effect within . . . Indian country as they have elsewhere." Despite this seemingly absolute language, the Court found nothing in the statute or its history "remotely resembling an intention to confer general state civil regulatory control over Indian reservations." 426 U. S., at 384. The Court noted that several other statutes passed by the same Congress— the so-called Termination Acts[6]—expressly conferred upon the States general regulatory authority over certain Indian tribes. Construing Pub. L. 280 and the Termination Acts *in*

---

[5] In several other federal statutes regulating Indian affairs, Congress has chosen to incorporate substantive state standards into federal law. *E. g.,* 18 U. S. C. § 13 (Assimilative Crimes Act); 18 U. S. C. § 1153 (Major Crimes Act). These statutes, of course, do not confer any regulatory or enforcement jurisdiction on the States.

[6] See, *e. g.,* 68 Stat. 718, 25 U. S. C. § 564; 68 Stat. 769, 25 U. S. C. § 726; 68 Stat. 1103, 25 U. S. C. § 757.

*pari materia,* the Court concluded that "if Congress in enacting Pub. L. 280 had intended to confer upon the States general civil regulatory powers . . . over reservation Indians, it would have expressly said so." 426 U. S., at 390.

I reach the same conclusion here. This Court has held in other contexts that federal statutes requiring "compl[iance] with . . . State . . . requirements" do not require that the party obtain a state permit or license. *E. g., Hancock* v. *Train,* 426 U. S. 167 (1976) (interpreting § 118 of the Clean Air Act, 42 U. S. C. § 1857f); *EPA* v. *California State Water Resources Control Board,* 426 U. S. 200 (1976) (interpreting § 313 of the Federal Water Pollution Control Act Amendments of 1972, 33 U. S. C. § 1323). The federal agency charged with administering Indian affairs takes the position that § 1161 does not authorize States to enforce their liquor licensing requirements on Indian reservations, *Applicability of the Liquor Laws of the State of Montana on the Rocky Boy's Reservation,* 78 I. D. 39 (1971), and this agency interpretation is entitled to deference.[7] The only other Court of

---

[7] Relying on a 1954 opinion issued by the Solicitor of the Department of the Interior, the Court states that the Bureau of Indian Affairs "contemplated that liquor transactions on reservations would be subject to . . . state licensing laws." *Ante,* at 729. In fact, the sole question presented to the Solicitor in 1954 was whether § 1161 authorized a tribe to limit the types of liquor sales permitted on a reservation, *i. e.,* whether the tribe could permit package sales but not sales for on-premises consumption. The Solicitor stated that the tribe could impose such a limit, and that an individual who sold liquor for on-premises consumption would be subject to federal prosecution even if he had obtained a state license permitting on-premises sales. The state license, in other words, would have no effect as far as federal law was concerned. But the Solicitor reserved decision on the question presented in this case:

"What acts would constitute a violation of the liquor laws of the State of California, is not a matter upon which at this time it is appropriate for me to express an opinion. Nor would it be appropriate for me to discuss the liquor licensing authority of the State Board of Equalization . . . ." *Liquor—Tribal Ordinance Regulating Traffic Within Reservation,*

Appeals to have considered the question has taken the same position. See *United States* v. *New Mexico,* 590 F. 2d 323 (CA10 1978), cert. denied, 444 U. S. 832 (1979).[8]  Because nothing in the language or legislative history of § 1161 indicates any intent to confer licensing authority on the States, I would hold that California's attempt to require Indian traders to obtain state liquor licenses is pre-empted by federal law.

The Court obviously argues to a result that it strongly feels is desirable and good.  But that, however strong the feelings may be, is activism in which this Court should not indulge.  I therefore dissent.

---

No. M–36241 (Sept. 22, 1954), reprinted in 2 Op. Solicitor of Dept. of Interior Relating to Indian Affairs 1917–1974, pp. 1648, 1650.

The Solicitor addressed this reserved issue directly in 1971:

"If Congress had intended to impose state law here with state enforcement jurisdiction, we think Congress would have expressly granted jurisdiction to the states under 18 U. S. C. sec. 1161, which it did not do.  Rather, we believe the intent was merely to require the state liquor laws to be used as the standard of measurement to define lawful and unlawful activity on the reservation." 78 I. D., at 40.

[8] See also F. Cohen, Handbook of Federal Indian Law 308 (1982) ("[S]ection 1161 incorporates state liquor laws as a standard of measurement to define what conduct is lawful or unlawful under federal law. . . . [R]eservation Indians need not obtain a state liquor license to sell lawfully").